LUCE & Co., S. en C., peticionaria, *v.* JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, demandada; JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, peticionaria, *v.* LUCE & Co., S. en C., demandada.

*Números:* 67, 71. *Resueltos:* 5 de noviembre de 1962

426

*Hartzell, Fernández & Novas* y *Héctor M. Laffitte,* abogados del patrono; *J. B. Fernández Badillo, Procurador General, José Orlando Grau* y *Rafael Buscaglia, Hijo,* abogados de la Junta de Relaciones del Trabajo de Puerto Rico.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Dos cuestiones debemos resolver en este caso, a saber: ¿Incurre una parte en un convenio colectivo en una práctica ilícita del trabajo de acuerdo con el inciso (d) de la sección 1 del Art. 8 de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 69, al negarse a (1) negociar y someter a arbitraje los términos claros e indubitables de una cláusula de un convenio, por el hecho de que la otra parte levante objeciones al ejercicio de la facultad concedida por la cláusula en cuestión, basadas en interpretaciones que no se ajustan a los términos ni al sentido literal de la disposición, pero que se alega surgen de aseveraciones conflictivas con respecto a la intención de las partes en el momento de convenir la referida cláusula?; (2) ¿arbitrar con respecto a alteraciones del horario de trabajo cuando la otra parte se opone a las mismas alegando no han surgido las circunstancias que según el convenio las justifican?

Creemos que como cuestión de derecho no se ha incurrido en la referida práctica ilícita del trabajo en ninguno de los dos casos.

Examinemos los hechos y la decisión de la Junta de Relaciones del Trabajo de Puerto Rico.

La peticionaria, Luce & Co., S. en C., suscribió un convenio colectivo para los años 1958 y 1959 con la Unión Local Núm. 847 y la Unión Local 801, como representantes de sus empleados, ambas afiliadas al Sindicato de Trabajadores UPWA-AFL-CIO.

En abril 7 de 1959, la Unión Local 847 y el referido Sindicato radicaron ante la Junta, contra la peticionaria, un cargo de prácticas ilícitas del trabajo bajo el Art. 8, sección 1, incisos (a) y (f) de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 69, consistente de violar los artículos IV y XI(f) del convenio colectivo vigente entre dichas partes.[1] La Junta radicó querella en abril 9 del mismo año contra la peticionaria, a nombre de las querellantes Uniones Locales 847 y 801 del Sindicato en cuestión, imputándole a la peticionaria no tan sólo la violación de las referidas disposiciones del convenio, sino también el negarse a negociar colectivamente, lo cual constituye una práctica

---

[1] El artículo IV lee así:
"HORAS DE COMENZAR Y TERMINAR EL TRABAJO
Toda labor en el cultivo y recolección de la caña empezará a las siete (7) de la mañana hasta las once (11) de la mañana y de las doce (12) del día hasta las cuatro (4) de la tarde, excepto en casos de fuerza mayor o circunstancias fuera del control de las partes, tales como interrupciones de la molienda o el tráfico por efectos de rotura en la maquinaria. Estas horas de comienzo y terminación podrán ser cambiadas de tiempo en tiempo por acuerdo entre EL PATRONO y la UNIÓN o su delegado. EL PATRONO podrá también fijar turnos adicionales que deberán comenzar a la terminación del turno anterior, sin perjuicio de cambiarse también las horas de comienzo y terminación de estos turnos especiales por acuerdo entre EL PATRONO y LA UNIÓN o su delegado."
El artículo XI(f) lee así:
"(f) Si durante la vigencia de este convenio EL PATRONO utilizare en sus operaciones ordinarias alguna máquina para cortar caña, antes de ponerse en operación tal máquina se deberán estipular los términos y condiciones entre la UNIÓN y EL PATRONO respectivos. Esta disposición no aplicará en cuanto a la operación de máquinas de cortar caña con fines experimentales. Se considerará que tal máquina se usa experimentalmente mientras durante la zafra no exceda su corte de cien (100) toneladas de promedio diario."

ilícita del trabajo bajo el Art. 8, sección 1, inciso (d) de la referida ley.(²)

Después de extensas vistas, el Oficial Examinador designado por la Junta determinó, y la Junta confirmó, que la peticionaria no había incurrido en violación de las disposiciones de la cláusula IV del convenio, y tampoco de la cláusula XI(f) del mismo por ser ésta nula. Sin embargo, tanto dicho oficial como la Junta determinaron que la peticionaria incurrió en la violación del referido inciso (d) al negarse reiteradamente a negociar con los querellantes el problema del uso de máquinas de cortar caña; al no hacer esfuerzo alguno, y por el contrario, rechazar de plano la proposición de las uniones querellantes para someter la precedente cuestión a arbitraje; y al no demostrar interés ni hacer esfuerzo alguno para lograr un acuerdo mediante negociación con respecto a los cambios en el horario de trabajo fijado por el artículo IV del convenio colectivo.

No conforme con tal decisión, la peticionaria radicó petición de revisión ante este Tribunal en 9 de febrero de 1960. En 15 de marzo de 1960 la Junta radicó ante nos una petición para que se pusiera en vigor su Orden de 28 de enero del mismo año, dictada en virtud y en armonía con las conclu-

---

(²)Los incisos (a), (d) y (f) de la sección 1 del referido Art. 8 proveen lo siguiente:

"(1) Será práctica ilícita de trabajo el que un patrono, actuando individualmente o concertadamente con otras:

(a) Intervenga, restrinja, ejerza coerción o intente intervenir, restringir o ejercer coerción con sus empleados en el ejercicio de los derechos garantizados por la sec. 65 de este título.

(d) Rehuse negociar colectivamente con el representante de una mayoría de sus empleados en una unidad apropiada de negociación colectiva, sujeto a las disposiciones de la sec. 66 de este título.

"(f) Viole los términos de un convenio colectivo incluyendo un acuerdo en el que se compromete a aceptar un laudo de arbitraje, esté o no dicho acuerdo incluido en los términos de un convenio colectivo; *Disponiéndose, sin embargo,* que la Junta podrá declarar sin lugar cualquier cargo en el cual se alegue una violación de este inciso, si la unión que es parte en el contrato es culpable de una violación en curso del convenio o no ha cumplido con una orden de la Junta relativa a alguna práctica ilícita de trabajo, según lo dispone este subcapítulo."

siones antes indicadas y, a solicitud de esta parte, en que concurrió la peticionaria, el Tribunal accedió a la consolidación de ambos recursos a los fines de su estudio y resolución conjuntamente.

La peticionaria señala cinco errores. Los tres primeros en realidad giran alrededor de la misma cuestión, o sea, si la Junta cometió o no error al resolver que la peticionaria rehusó negociar colectivamente con las querellantes de acuerdo con las disposiciones del referido inciso (d).

De acuerdo con la Junta, la negativa de la peticionaria de negociar, consistió en parte en (1) negarse a llevar al seno del Comité de Quejas y Agravios, (3) como lo solicitaban las querellantes, el problema del uso de máquinas para cortar caña alegando la peticionaria que no habiendo violado el convenio en cuanto al uso de tales máquinas, nada tenía que negociar; por el contrario, sugería a las querellantes que radicaron los cargos pertinentes ante la Junta (2) la falta de esfuerzo de la peticionaria para someter al arbitraje que solicitaban las querellantes, la controversia sobre el uso de la máquina de cortar que dio motivo al paro de abril 3, 1959.

---

(3) El artículo V del referido convenio colectivo dispone:
"COMITÉ DE QUEJAS Y AGRAVIOS

Por la presente se crea un Comité Local de Quejas y Agravios en cada localidad afectada por este convenio integrado por dos miembros designados por la UNIÓN y por el PATRONO. Ante ese Comité deberán ventilarse las querellas que surjan, y este Comité se reunirá no más tarde del quinto día siguiente a la radicación de la querella y tendrá plena autoridad para resolver por mayoría y previa la correspondiente investigación, todos los casos que se traigan a su consideración. Si este Comité no pudiera ponerse de acuerdo dentro de siete días laborables de formulada la querella, el asunto pasará a un quinto miembro designado por las partes. Las partes preferirán, siempre que sea posible, que actúe como quinto miembro o árbitro un funcionario del Negociado de Conciliación y Arbitraje del Departamento del Trabajo de Puerto Rico. Si no se pusieren de acuerdo dentro de tres días laborables siguientes a los siete anteriores, las partes quedan en libertad de llevar el asunto ante los organismos correspondientes, según se provea por Ley. En cualquier querella por cesantía que fuere resuelta a favor del obrero, el PATRONO pagará el tiempo perdido por aquél a partir de la fecha de su suspensión y lo repondrá en su empleo."

El récord demuestra que cada vez que se usó la máquina de cortar caña surgieron quejas y oposición de los obreros miembros de las querelladas, alegando sus líderes a nombre de ellos que la máquina era distinta a la contemplada, que el usar maquinaria para desplazar obreros estaba prohibido por el artículo XI(f) del convenio, que no se usaba para fines experimentales y que habían cortado más de 100 toneladas de caña con máquina, en ciertos días. Por el contrario, la peticionaria declaró que se habían usado distintos tipos de máquina de cortar caña en el pasado; que se podía usar la máquina en cuestión de acuerdo con el artículo XI del convenio; y que en dicho artículo claramente se había convenido que tal máquina "se usa experimentalmente mientras durante la zafra no exceda su corte de cien (100) toneladas de promedio diario"; que por lo tanto el uso no estaba limitado a cortar 100 toneladas en cada línea en que se usase. En cuanto a la falta de esfuerzo para someter a arbitraje la cuestión, argumentó la peticionaria que una vez surgió un paro en el trabajo motivado por el uso de la máquina permitida por la cláusula XI(f) del convenio, cesó la obligación de la peticionaria de arbitrar la controversia.

. El Oficial Examinador concluyó del testimonio de las partes, y la Junta confirmó: que existía un conflicto con respecto a la intención de las partes al incorporar el inciso (f) en la cláusula XI del convenio; (⁴) que por lo tanto

---

(⁴) El testigo de las querellantes, Sr. Robledo declaró lo siguiente: (T.E. págs. 442–443.)

"R.—Ellos trajeron una proposición no de 10,000 toneladas como promedio anual para la máquina cortadora de caña. La proposición esta, o sea, 15,000 toneladas promedio con la máquina cortadora de caña, 15,000 toneladas de caña en cada zafra, pero no con fines experimentales, o sea, labores ordinarias; nosotros nos opusimos a esa proposición y después vino otra contraproposición de 150 toneladas de caña como promedio diario y también la Unión estaba en condiciones de no aceptarla hasta que finalmente se determinó 100 toneladas de caña como promedio diario y con fines experimentales toda vez que...

R.—La cláusula originalmente vino redactada por el patrono y las enmiendas se las sugirió la Unión con fines experimentales que no venían insertadas en la cláusula original, y 100 toneladas promedio que trae 150

no hubo acuerdo con respecto a la misma; que aplica a la situación el Art. 1241 del Código Civil, 31 L.P.R.A. sec. 3479, (⁵) y en tal virtud se declaró nulo dicho inciso y se desestimó la querella de violación del artículo XI(f) del convenio.

En apoyo de la nulidad de la referida disposición por falta de intención al negociarse la misma, cita la Junta el acuerdo tomado por las partes que puso fin al paro en cuestión. Se acordó entonces que las partes se reunirían "para aclarar la interpretación del inciso (f) del artículo XI del convenio colectivo vigente", comprometiéndose la querellada a no usar las máquinas ·de cortar caña si las Uniones sumi-

---

toneladas de promedio rebajadas a 100; y en la Unión, después de considerar que la máquina cortadora de caña que ellos utilizaron en el 1957, creyendo la Unión que esa era la máquina cortadora de caña que iban a utilizar durante la presente zafra, se consideró que en aquella ocasión necesitaba de 18 a 20 picadores de caña detrás de las máquinas para cumplimentar la labor que realizaba la máquina; es decir, con 20 picadores y 5 toneladas de caña por hombre-día eran 100 toneladas, y a virtud de esas consideraciones que hicimos los miembros del Comité de Negociación de la Unión aceptamos las 100 toneladas de caña como promedio diario."

El Sr. Villamil, testigo de la peticionaria, declaró: (T.E. págs. 409 y 425.)

"... La proposición original fue de que se permitiera cortar dos mil toneladas de caña en la zafra con máquinas de este tipo, o sea, como si fuera con carácter experimental. Como contraproposición a ésta del Sr. Caraballo, se propuso lo que aparece actualmente en el convenio, o sea, que siempre y cuando se cortara un promedio de no más de 100 toneladas de caña diarias durante la zafra, se consideraría experimental. Las manifestaciones del Sr. Caraballo, al oir esta proposición, fueron: 'esto es mejor que lo que estábamos proponiendo porque dependiendo del número de días de zafra sería el total de toneladas de caña a cortarse por la máquina'."

"R. . . . . . . . . . .

... La primera proposición vino de la parte obrera, que fue la que yo mencioné que Caraballo dijo que se podían cortar 10,000 toneladas y en la discusión fue que surgió la proposición de la parte patronal la cual es esa que aparece ·ahí y entonces el señor Caraballo le dijo al señor Robledo que esa proposición era la mejor porque podían haber menos días de zafra."

(⁵) El Art. 1241 del Código Civil dispone:

"Sec. 3479. Decisión en cuanto a dudas; cuándo las dudas anularán el contrato

Cuando absolutamente fuere imposible resolver las dudas por las reglas establecidas en las secciones precedentes, si aquéllas recaen sobre

nistraban diariamente determinado número de trabajadores, y de no hacerlo así, entonces la querellada podía utilizar las máquinas para cortar la caña que, por razón de la no asistencia al trabajo por los obreros, se dejare de cortar.

No creemos que, de haber sido en realidad nulo el inciso en cuestión, la peticionaria podía libremente usar la referida máquina, pues su uso conllevaba necesariamente una alteración o modificación que afectaba sustancialmente las condiciones de trabajo y, por lo tanto, tal uso estaba sujeto a consideración por y obligaba a la demandada a discutirlo en el Comité de Quejas y Agravios, al traerse ante el mismo por vía de querella por las Uniones, de acuerdo con la cláusula V del convenio. *Drake Bakeries* v. *Bakery Workers,* 370 U.S. 254 (1962) ; *Consolidated Aircraft Corp.* v. *N.L.R.B.,* 141 F.2d 785 (1944).

Como llegamos a la conclusión de que la referida disposición no es nula, según se verá más adelante, y en vista que la querella se basó en el incumplimiento del artículo XI(f) y no del artículo V del convenio, no procede que tomemos decisión alguna a base de la situación que acabamos de señalar.

A nuestro juicio, los términos de la cláusula XI(f) del convenio son claros y no dejan lugar a dudas sobre la intención de los contratantes, y por lo tanto, hay que atenerse al sentido literal de la misma, según lo dispone el Art.

circunstancias accidentales del contrato, y éste fuere gratuito, se resolverán en favor de la menor transmisión de derechos e intereses. Si el contrato fuere oneroso, la duda se resolverá en favor de la mayor reciprocidad de intereses.

Si las dudas de cuya resolución se trata en esta sección recayesen sobre el objeto principal del contrato, de suerte que no pueda venirse en conocimiento de cuál fue la intención o voluntad de los contratantes, el contrato será nulo." —Código Civil, 1930, art. 1241.

1233 del Código Civil vigente, 31 L.P.R.A. sec. 3471.(6) La cláusula en cuestión, en primer lugar, dispone que antes de usarse *alguna* maquinaria para cortar caña en *operaciones ordinarias*, se deberán estipular los términos y condiciones entre la Unión y el patrono con respecto a su uso. Sobre eso no existe conflicto. Pero luego la cláusula estipula que la anterior disposición no se aplica en cuanto a la operación de maquinaria de cortar caña con fines experimentales. De manera que cuando se usa tal maquinaria con fines experimentales no existe obligación alguna de negociar con respecto a tal uso. La posible cuestión sobre qué constituye un uso experimental se anticipó, para así evitar que diera lugar a conflictos entre las partes, al incluirse en la cláusula una disposición final que define lo que constituye uso experimental, o sea, que *"durante la zafra no exceda su corte de cien (100) toneladas de promedio diario."* [Énfasis nuestro.] El término "zafra" quiere decir el tiempo que dura la cosecha de caña de azúcar, o sea, el número de días que dura tal operación en cada año de la industria. De manera que la frase "durante la zafra" fija el número total de días cubiertos por la definición. La palabra "promedio" quiere decir término medio, de manera que en este caso el término medio son 100 toneladas. La unidad convenida con respecto a tal término medio es el día. Así, dicha disposición final claramente quiere decir que la caña cortada por tal máquina, a los fines de considerarse su uso como experimental, durante el monto de días que dure la zafra, no puede exceder de un término medio de 100 toneladas diarias. El uso de la palabra "alguna" al referirse a la máquina de cortar, en la primera

---

(6) Esta disposición lee así:

"Sec. 3471. Sentido literal deberá ser observado; cuándo prevalecerá la intención

Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.

Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas." —Código Civil, 1930, Art. 1233.

parte de la cláusula que venimos analizando, excluye la interpretación de que la disposición se refiere a determinada máquina. Tampoco cabe la interpretación de que el uso del artefacto está estrictamente limitado a uso experimental como corrientemente se entiende el uso de esa frase en actividades científicas, pues la cláusula claramente define lo que quiere decir "uso experimental". Y, por último, tampoco puede interpretarse la limitación de 100 toneladas como aplicable a cada día de trabajo. Tal interpretación deja de tomar en consideración y de darle significación al término "promedio" y por tanto violenta y es inconsistente con los términos claros de la definición de "uso experimental" en la cláusula en cuestión. Consideramos, por lo tanto, que no procedía declarar nula dicha cláusula de acuerdo con el Art. 1241 del Código Civil, sino que, por el contrario, la misma es válida y efectiva y debe estarse al sentido literal de la misma, según lo exige el Art. 1233 del referido Código.

El hecho que en una negociación subsiguiente al otorgamiento del convenio con el propósito de poner fin a un estado de huelga, se aceptase "aclarar la interpretación del inciso (f) del atículo XI", lejos de constituir "prueba clara y definitiva de la ausencia de intención común de las partes" sólo podría ser indicativo del esfuerzo de hacer más entendible lo que es de por sí claro, y del deseo manifiesto de las partes, dada las circunstancias de que la continuación del paro sería ruinosa para ambas partes, de ponerse de acuerdo, accediendo una parte a negociar una aclaración ulterior de la disposición a cambio de poder usar la máquina de cortar caña cuando las Uniones dejen de suministrar determinado número de trabajadores diariamente. La jurisprudencia de este Tribunal sostiene esta conclusión.

En el caso de *Solá* v. *Orcasitas*, 11 D.P.R. 81 (1906) se trataba de una venta con pacto de retro de una casa en que el dueño se obligó por escrito a "avisar al Sr. Orcasitas al principio del quinto año si ha de recuperar la finca

al vencerse los seis años, o sea, un año con anticipación porque está convenido el retro, sin cuyo aviso quedará desde esa fecha la condición de retro." El aviso en cuestión se dio seis días después de vencido el año anterior al vencimiento de los seis años. La demandante dueña de la finca alegó que las palabras de la referida estipulación resultan absolutamente contrarias a la intención que el demandado supone tuvieran los contratantes. Alegó, además, que la cláusula era tan obscura y dudosa que de ella no puede determinarse la intención de las partes con respecto al término convenido para dar el aviso. Este Tribunal, por el contrario, determinó que, no obstante los errores que existen en la cláusula que son más de palabras que de concepto, la verdadera intención de los contratantes se demuestra por la lectura de la cláusula en sí, disponiendo que no es de aplicación al caso el Art. 1241 del Código Civil antes citado sino los Arts. 1233 y 1234 de dicho cuerpo de ley. *Sucn. de Alfredo Ramírez de Arellano, etc.* v. *Tribunal Superior de Mayagüez,* 81 D.P.R. 357 (1959); *Caballero* v. *Kogan,* 73 D.P.R. 666 (1952); *National City Bank* v. *Martínez,* 41 D.P.R. 163 (1930); *Finlay* v. *Finlay Brothers & Waymouth Trading Co.,* 8 D.P.R. 389 (1905); Manresa, *Comentarios al Código Civil Español,* 5a. ed., 1950, tomo VIII, págs. 499–500.

Concluye la Junta que la obligación de negociar sobre la interpretación y aplicación de un convenio colectivo subsiste aun cuando el patrono crea de hecho no haber violado el convenio colectivo, y cita en apoyo de su conclusión, entre otros, el caso de *N.L.R.B.* v. *Sands Mfg. Co.,* 306 U.S. 332 (1939) en el cual el Tribunal Supremo de Estados Unidos sentó la siguiente doctrina:

" . . . . . . . . .

Pero asumimos que la Ley impone al patrono la obligación adicional de reunirse y negociar con los representantes de sus empleados con respecto a propuestos cambios en un contrato

existente y además de discutir con ellos su verdadera interpretación, *si hubiere alguna duda en cuanto a su significado.* [Énfasis nuestro.]

La obligación de negociar con respecto a la verdadera interpretación de un contrato, de acuerdo con la referida doctrina, surge *cuando existe cualquier duda con respecto a su significado.* En el caso de *Sands* la corte resolvió que los términos del contrato con respecto a antigüedad en el empleo no eran ambiguos, como no lo son en el caso ante nos los relativos al uso de maquinaria para cortar caña. En dicho caso la corte observó que el patrono negoció a cabalidad con la Unión, no obstante ser claras las disposiciones del convenio que eran objeto del conflicto. Es posible que tal lenguaje es lo que dé lugar a que el caso se cite en apoyo de que existe obligación de negociar aunque los términos del convenio sean claros.

En *N.L.R.B.* v. *Neward Morning L. Co.,* 120 F.2d 262 (1941), se trataba de un cargo de práctica ilícita consistente en el despido de un empleado en violación de la disposición del convenio de que no se despida o discrimine contra empleado alguna por ser miembro de la Unión. En reconsideración, la corte resolvió que:

"El derecho de negociar colectivamente es, sin embargo, necesariamente un derecho continuo. Corrientemente los convenios colectivos, como en este caso, se negocian por períodos de tiempo definitivamente limitados. Las negociaciones para su renovación deben tener lugar periódicamente y pueden comenzarse, por lo menos preliminarmente, poco después de firmarse el contrato anterior. Además, en cualquier momento puede hacerse deseable y hasta necesario el negociar colectivamente para la modificación de un convenio colectivo existente que en la práctica se ha demostrado que es injusto o impracticable o para resolver querellas o alegadas violaciones de tal convenio. Se ve pues que la negociación colectiva es un proceso continuo y de desarrollo por virtud del cual, la ley ahora lo reconoce, la relación entre el patrono y el empleado ha de moldearse y los términos y condiciones del empleo han de modi-

ficarse progresivamente en forma que sea mutuamente satis-
factoria a todas las partes concernidas. No es un procedi-
miento separado y aislado que tan pronto como se refleja en
un convenio escrito se convierte en un resultado final y
permanente."

Obviamente, en este caso la expresión de la corte de que
la ley le da a los empleados el derecho de negociar cambios
en un convenio en vigor si sus disposiciones no son suscep-
tibles de ponerse en práctica, o son injustas, es *obiter dictum*
pues la controversia en el caso no envolvía cambio alguno en
un convenio sino el hacer cumplir una obligación de negociar
prescrita por ley para proteger los derechos de organización
que pueden ser debilitados por despidos discriminatorios.
Además en el caso ante nos, las cláusulas en cuestión eran
susceptibles de ponerse en práctica, no eran injustas y por
el contrario iban dirigidas a resolver controversias y a pro-
veer forma y manera de obviarlas y evitarlas en lo sucesivo
mediante una definición más clara de los derechos de las
partes. 63 Harv. L. Rev. 1097 (1950).

En *Rapid Roller Co. v. N.L.R.B.*, 126 F.2d 452 (1942),
el patrono sostenía que la interpretación de las disposiciones
de un convenio no son negociables. De hecho la corte con-
cluyó que no podía decir que el convenio estuviese libre de
toda duda. La cláusula en controversia exigía que todos los
solicitantes de empleo debían referirse al Comité de Taller
antes de ir a trabajar. El patrono dio empleo a 4 nuevos
empleados que empezaron a trabajar en determinada fecha.
No se consultó al referido comité antes de colocarlos pero
fueron presentados al comité cuando se presentaron al tra-
bajo. La Unión alegó que existía un problema de transfe-
rencia de empleo por vía de promoción y que se debió referir
a tales personas al comité antes de ir a trabajar, en vez
de colocarlos y entonces traerlos al taller para representarlos
a los miembros del comité. Obviamente surgió una contro-
versia de interpretación del convenio que exigía negociación.

En *Timken Roller Bearing Co.* v. *N.L.R.B.* 161 F.2d 949 (1947), la Unión exigió se le consultase sobre subcontratos. La práctica de 25 años era que ésta era una función de la gerencia con la cual no había intervenido la Unión. Pero no se incluyó específicamente en la llamada cláusula de gerencia en que se enumeraron como funciones exclusivas de la compañía el derecho de colocar, suspender o despedir por causa o transferir o relevar del empleo por falta de trabajo siempre que tales derechos no se ejerciten para fines discriminatorios contra cualquier miembro de la Unión. La corte resolvió que la interpretación práctica de la cláusula de gerencia de ambas partes era que la contratación era una función de gerencia; no obstante, según se desarrolló, la controversia se basaba en una interpretación de la cláusula de gerencia que debería ser dirimida por el procedimiento de quejas y, de no ser posible, por arbitraje. La corte evidentemente distinguió entre una interpretación práctica y el hecho que el derecho de subcontratar no estaba incluido específicamente en la cláusula de gerencia y, por lo tanto, se justificaba concluir que existía una controversia negociable con respecto a la exigencia de la Unión de tener intervención en la subcontratación.

En *Consolidated Aircraft Corp.* v. *N.L.R.B.*, supra, se determinó que la reclamación de la Unión de que se pague doble tiempo a los obreros de un tercer turno por las horas trabajadas durante los días domingo cae bajo la cláusula del convenio que provee para el arbitraje de diferencias y desacuerdos, no obstante proveer el contrato paga especial para ese turno. Pero dicha cláusula no incluía ni tampoco excluía tal reclamación, y por lo tanto, constituía una controversia negociable.

El caso de *Carroll's Transfer Co.*, 56 N.L.R.B. 935 (1944), meramente resuelve que una parte no puede modificar un convenio unilateralmente, sino mediante negociación con la

otra. No resuelve que surge la obligación de negociar sobre tales modificaciones al solicitarse éstas. ■■■■

Aunque el convenio colectivo se utiliza en un campo de actividad gobernado por reglas especiales, distinto de aquéllos en que corrientemente se contrata, y que su propósito es también de otra naturaleza, no es por ello menos que un contrato y, por lo tanto, debe regirse por las disposiciones del Código Civil vigente, a menos que por ley se haya dispuesto otra cosa. Véase *Rivera Adorno* v. *Autoridad de Tierras*, 83 D.P.R. 258 (1961). Es, por consiguiente, la ley entre las partes; en ausencia de disposiciones especiales en el mismo o de mediar circunstancias que en derecho lo justifiquen, ninguna de las partes está obligada a negociar con respecto a disposiciones indubitablemente claras de un convenio; ni puede éste modificarse ni alterarse unilateralmente, ni parte alguna en un convenio está obligada a negociar cambios en su contenido a petición de la otra. De no ser así, se frustrarían los fines de la Ley de Relaciones del Trabajo de Puerto Rico y la política pública expresada en la misma, (⁷) ya que en tal caso el convenio dejaría de proveer certeza, seguridad y continuidad a los derechos de las partes establecidos por la negociación; por el contrario, sería fuente y motivo de contínuas disputas y conflictos entre las partes. Por supuesto, que cuando un convenio contempla que se puede negociar con respecto a modificación del mismo, existe la

_____

(⁷) Son parte de la política pública relacionada en dicha ley los siguientes principos: 29 L.P.R.A. sec. 62.

"

"(1)

"(2) Paz industrial, salarios adecuados y seguros para los empleados, así como la producción ininterrumpida de artículos y servicios, a través de la negociación colectiva, son factores esenciales para el desarrollo económico de Puerto Rico. El logro de estos propósitos depende en grado sumo de que las relaciones entre patronos y empleados sean justas, amistosas y mutuamente satisfactorias y que se disponga de los medios adecuados para resolver pacíficamente las controversias obrero-patronales.

(3) A través de la negociación colectiva deberán fijarse los términos y condiciones de empleo. A los fines de tal negociación, patronos y em-

obligación de así hacerlo. *N.L.R.B.* vs. *Lion Oil Co.*, 352 U.S. 282 (1957). ■

Sostenemos, por lo tanto, que siendo la cláusula XI (f) del convenio en discusión meridianamente clara, no existía obligación alguna en derecho de negociar con respecto a su contenido, alcance o significado, y por lo tanto, el negarse a hacerlo no constituyó una práctica ilícita del trabajo bajo el inciso (d) de la sección 1 del Art. 8 de la Ley de Relaciones del Trabajo de Puerto Rico. ■

Se alega que el uso de la máquina de cortar caña y la negativa de la peticionaria de negociar su uso trajo como consecuencia un paro en el trabajo. La peticionaria señala esta determinación como el quinto error. Alega que tal paro se llevó a cabo en violación de una cláusula de no huelga en el convenio, (8) y que por lo tanto, una vez ocurrió el paro, la peticionaria no venía obligada a negociar el uso de la referida máquina. La Junta sostuvo que la huelga ocurrió como consecuencia de la negativa ilegal del patrono a negociar sobre la interpretación y aplicación del convenio y que la cláusula de no huelga en el convenio no contiene una renuncia expresa de ese derecho cuando el patrono incurriere en prácticas ilí-

---

pleados tendrán el derecho de asociarse en organizaciones por ellos mismos escogidas.

(5) Todos los convenios colectivos vigentes, y los que se hagan en el futuro, por la presente se declaran instrumentos para promover la política pública del Gobierno de Puerto Rico en su esfuerzo de fomentar la producción hasta el máximo; y se declara que como tales están revestidos de un interés público. El ejercicio de los derechos y el cumplimiento de las obligaciones de las partes en dichos convenios colectivos queda, por tanto, sujetos a aquella razonable reglamentación que sea necesaria para lograr las normas públicas de este subcapítulo."

(8) "Artículo IX. Huelga y 'Lockout'. Durante la vigencia de este convenio colectivo no se empleará por parte de la UNIÓN y sus uniones filiales, a cuyo empleo se contrae el mismo, el recurso de la huelga, ni se llevarán a cabo paralizaciones del trabajo con perjuicio de los intereses del PATRONO, ni podrá tampoco el PATRONO emplear el cierre forzoso (Lockout) contra los trabajadores, debiendo someterse toda disputa al Comité Local de Quejas y Agravios según queda provisto anteriormente en este convenio. Cualquier fallo será tal y como queda estipulado en dicho Artículo."

citas del trabajo. Tiene razón la peticionaria, ya que el paro no fue consecuencia de y en protesta contra la comisión por la peticionaria de una práctica ilícita del trabajo relacionada con el uso de la máquina de cortar caña ni con su negativa justificada de negociar con respecto a tal uso. El caso de *Mastro Plastic Corp.* vs. *N.L.R.B.*, 350 U.S. 270 (1956), no es aplicable pues se trataba en él de una huelga motivada por una práctica ilícita del trabajo del patrono. Eso no es el caso que nos ocupa. Tampoco sostiene la contención de la Junta el caso de *Dorsey Trailers, Inc.*, 80 N.L.R.B. 478 (1948), pues allí se trataba de un cierre (*lockout*) por el patrono en represalia por un paro de los obreros injustificado por estar basado en el despido del trabajo, por causa de un agente de la Unión. *No existía cláusula de no huelga en el convenio.* La Junta Federal resolvió que el cierre era discriminatorio y en violación de la ley *ya que la huelga es un derecho que no había sido renunciado por convenio y que no se renuncia al mismo por implicación,* como por ejemplo al aceptarse una cláusula para resolver toda disputa mediante el procedimiento de quejas y agravios. ∎

. El segundo fundamento para justificar la determinación de que la peticionaria se negó a negociar colectivamente consistió en que al surgir la disputa sobre cambios de horas de trabajo, la peticionaria se negó a que la misma se llevase a arbitraje y en otras ocasiones se negó a reunirse para discutirla a pesar de los requerimientos al efecto del presidente de una de las Uniones, tanto de palabra como por cartas y telegramas. El asunto llegó a discutirse dos veces en el Comité de Quejas y Agravios sin que las partes en tales ocasiones llegasen a un acuerdo. La peticionaria alegó que la cláusula IV del convenio confería un derecho indubitable y claro de hacer cambios en horas cuando lo requiriese alguna fuerza fuera del control de las partes, *tales como* interrupciones de la molienda o el tráfico por efecto de roturas en la maquinaria. La peticionaria alegó que cada cambio de

horas se debió a fuerza mayor señalando como tal la falta de vagones en los distintos sitios (chuchos) donde debían cargarse de caña, motivada dicha falta porque tales vagones amanecían llenos de caña, especialmente los sábados, en la plaza de caña de la Central. Aunque esta causal no está incluida específicamente entre las de fuerza mayor enumeradas en la referida cláusula IV, la Junta llegó a la conclusión que había existido causa mayor que justificaba los cambios de turno, pero que se cometió la práctica ilícita del trabajo que acabamos de indicar: Es evidente de la faz del artículo IV del convenio que la peticionaria no tenía discreción absoluta para cambiar las horas de trabajo. Sólo podía realizarlo por la causa estipulada en dicha disposición. Realizado un cambio de hora e impugnada por la Unión la existencia de la justificación para el cambio quedaban las partes obligadas a dirigir la querella de acuerdo con la cláusula V del convenio, o sea, por el Comité de Quejas y Agravios o por arbitraje o por los organismos correspondientes. *Drake Bakeries* v. *Bakery Workers*, supra. Al negarse a arbitrar la cuestión, posiblemente incurrió la peticionaria en la práctica ilícita de violación de la cláusula V del convenio, de acuerdo con el inciso (f) de la sección 1 del Art. 8 de la Ley de Relaciones del Trabajo. Esta cuestión no está ante nos ya que al negarse la peticionaria a cumplir con la cláusula V del convenio que proveía para el arbitraje, no se radicó querella contra la peticionaria basada en la violación de tal cláusula V. Réstanos, por lo tanto, resolver en cuanto a esta cuestión, si la negativa a someter la referida disputa a arbitraje constituye una práctica ilícita del trabajo de acuerdo con el inciso (d) de la Sección 1 del Art. 8 de la Ley de Relaciones del Trabajo.

En el caso de *United Telephone Company of the West and United Utilities, Incorporated and International Brotherhood of Electrical Workers, Local No. 843 AFL,* 112 N.L.R.B. 779 (1955), bajo un convenio que disponía una

semana de trabajo de 40 horas. de cinco días de 8 horas y paga de tiempo y medio por el trabajo realizado en exceso de tales límites, el patrono redujo la jornada de trabajo en un departamento al límite establecido por el convenio; dicha jornada durante los 7 u 8 años anteriores había sido de 48 horas a la semana.. La Unión alegó que el cambio violaba otra cláusula del convenio que disponía que los privilegios y beneficios existentes hasta entonces y no mencionados o cambiados por el convenio, permanecerán inalterados a menos que se cambien por consentimieno de las partes. El conflicto se discutió ampliamente entre las partes y, al no llegar a un acuerdo, la Unión propuso se sometiese a arbitraje de acuerdo con la cláusula de arbitraje del convenio. El patrono sugirió se radicase una acción de sentencia declaratoria y al efecto radicó tal acción. La Unión radicó querella alegando que la negativa de arbitrar constituía una práctica ilícita del trabajo bajo la disposición del inciso 5 de la sección (a) del Art. 8 de la Ley Taft-Hartley(⁹) (que es idéntica a la disposición .(d), sección 1 del Art. 8 de la Ley de Relaciones del Trabajo de Puerto Rico). La Junta Nacional resolvió que el negarse a arbitrar la disputa no constituía de por sí una violación de la Ley Taft-Hartley y que dicha Junta no era el foro adecuado para remediar una violación del convenio o para gestionar su cumplimiento específico.(¹⁰) Véase además *McDowell Aircraft Corporation*, 109 N.L.R.B. 930 (1954); *Textron Puerto Rico (Tricot Division)*, 107 N.L.R.B. 583 (1953).

A nuestro juicio, por lo tanto, la peticionaria tampoco incurrió en una práctica ilícita bajo el referido inciso (d) al negarse a arbitrar el cambio de horas en cuestión.

---

(⁹) Ley Nacional de Relaciones Obrero-Patronales, 1947, 61 Stat. 136, 29 U.S.C.A. sec. 14.

(¹⁰) Bajo la ley local la violación de convenio constituye una práctica ilícita y la Junta Estatal es el foro adecuado para dirimir la cuestión. Véase *P. R. Telephone Co.* v. *Junta Relaciones del Trabajo*, 86 D.P.R. 382 (1962).

No es necesario que consideremos el cuarto([11]) error señalado por la peticionaria. Ya hemos resuelto que las negativas a arbitrar en este caso no constituyen práctica ilícita del trabajo imputada a la peticionaria por la Junta bajo el inciso (d) *supra.* Se dispone del caso adecuadamente por otros fundamentos previamente expuestos en esta opinión.

*En resumen, concluimos que no habiendo incurrido la peticionaria en la práctica ilícita del trabajo que motiva la orden de la Junta en este caso, procede revocar dicha orden y en tal virtud denegar la petición de la Junta para ponerla en vigor.*

---

([11]) El referido cuarto error lee así:

"4. La Junta cometió error grave en violación del debido proceso de Ley de la Constitución del Estado Libre Asociado de Puerto Rico al basar su Decisión y Orden en la negativa de Luce & Co. en aceptar como árbitro al Hon. Juez Miguel Velázquez Rivera, quien fuera propuesto por el Presidente de la Junta, quien también tiene la función de decidir los casos sometidos ante ese cuerpo."