Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IV

| | | |
|---|---|---|
| CERVECERA DE PUERTO RICO<br>Peticionario<br><br>v.<br><br>UNIÓN INDEPENDIENTE DE TRABAJADORES DE CERVECERÍA INDIA<br>Recurrido | TA2025CE00660 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.:<br>SJ2021CV06652 (506)<br><br>Sobre:<br>Impugnación Laudo de Arbitraje Sobre Terminación de Relación Laboral, Sr. Luis O. Ruíz Aquino |

Panel integrado por su presidenta, la Jueza Ortiz Flores, el Juez Bonilla Ortiz y la Jueza Martínez Cordero

**Ortiz Flores, Jueza Ponente**

#### SENTENCIA

En San Juan, Puerto Rico, a 21 de noviembre de 2025.

Comparece ante este Tribunal de Apelaciones la compañía Cervecera de Puerto Rico (Cervecera; peticionaria) mediante el recurso de epígrafe y nos solicita que revoquemos la Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI) el 22 de septiembre de 2025 y notificada en esa misma fecha.

Adelantamos que expedimos el auto de *certiorari* y confirmamos el dictamen recurrido.

**I**

El 12 de octubre de 2021, la peticionaria instó ante el foro de instancia una *Solicitud de Revisión de Laudo de Arbitraje*.[1] En dicho escrito, la Cervecera solicitó que se revocara el Laudo emitido por el Negociado de Conciliación y Arbitraje el 7 de septiembre de 2021 y determinara que la terminación de empleo del señor Luis O. Ruiz Aquino (Sr. Ruiz) fue conforme al Convenio Colectivo pactado entre la peticionaria y la Unión

---

[1] SUMAC, Entrada 1 en SJ2021CV06652.

Independiente de Trabajadores de Cervecería India (Unión; recurrida).[2]

Dicho Laudo, del cual la Cervecera procuró revisión, determinó que por hechos acontecidos el 3 de diciembre de 2019, el Sr. Ruiz fue despedido injustificadamente. Además, estableció que un empleado temporero y un empleado en periodo probatorio son dos conceptos distintos por lo que no se puede ser ambos al mismo tiempo, así que concluyó que el Sr. Ruiz era un empleado temporero y así lo respaldaba el contrato de empleo. Por tal motivo, ordenó a la Cervecera a cumplir con lo establecido en la Sección 3(f) del Artículo 9 del Convenio Colectivo. Esta dispone lo siguiente:

> En caso de suspensión o despido de un obrero, si se ordenase por resolución final del árbitro la restitución en el trabajo, LA COMPAÑÍA le pagará a dicho obrero el importe del salario dejado de devengar en aquel periodo o término en que el árbitro considere que estuvo indebidamente suspendido o despedido, más una penalidad igual al veinticuatro por ciento (24%) del salario dejado de devengar. A esto se le restarán los ingresos devengados mientras estuvo despedido o suspendido y los que pudo haber devengado de haber hecho las gestiones razonables para obtener empleo o desempeñar cualquier otra actividad que le generara ingresos ("gainful activity"), para determinar lo cual, se seguirán las normas de la Junta Nacional de Relaciones del Trabajo sobre mitigación de daños.[3]

Presentada la solicitud, la Unión expuso su oposición y alegó que la Cervecera pretendía evadir su responsabilidad al aplicar a un trabajador temporero, amonestaciones correspondientes a trabajadores probatorios.[4] Luego de algunos trámites procesales, el tribunal notificó el 4 de enero de 2022 que el caso quedó sometido para consideración y determinación.[5] Finalmente, el 22 de septiembre de 2025 el foro primario emitió *Sentencia* donde realizó las siguientes determinaciones de hechos:

1. Cervecera y la Unión suscribieron un Convenio Colectivo vigente desde el 6 de septiembre de 2018 hasta el 5 de septiembre de 2021.
2. El Artículo 6 del Convenio Colectivo, titulado Empleados Probatorios, dispone en la sección 3:
   > Todo nuevo empleado trabajará con arreglo a las disposiciones de este convenio y será reclutado por un período probatorio de seis (6) meses, durante los cuales LA COMPAÑÍA podrá despedirlo sin ulterior recurso. Un

---

[2] *Id.*
[3] SUMAC, Entrada 1 en SJ2021CV06652, Apéndice – Parte I, pág. 171.
[4] SUMAC, Entrada 6 en SJ2021CV06652.
[5] SUMAC, Entrada 11 en SJ2021CV06652.

empleado temporero que ejerza una posición y luego sea nombrado en esa misma posición se le contará el tiempo trabajado en dicha posición como parte del período probatorio hasta completar los seis (6) meses, durante los cuales LA COMPAÑÍA podrá despedirlo sin ulterior recurso.

3. El Artículo 8 del Convenio Colectivo, titulado Acciones Disciplinarias, dispone, en lo pertinente:

    1. La Compañía puede suspender o despedir de empleo y sueldo en forma sumaria a cualquier empleado que en el desempeño de sus funciones:

    [...]

        ch. Grave daño (de un monto de $5,000.00 o más) a la propiedad de la Compañía resultante por negligencia o acto intencional.

4. El Artículo 9 del Convenio Colectivo, titulado Comité de Quejas y Agravios, dispone, en lo pertinente:

    ARBITRAJE

    […]

    b. El árbitro no tendrá autoridad para alterar, enmendar, modificar, añadir o restar a las disposiciones de este convenio. Todas las decisiones del árbitro estarán en estricto acuerdo con las disposiciones del convenio y conforme a derecho.

5. El Artículo 37 del Convenio Colectivo, titulado Empleados Temporeros, dispone, en parte, lo siguiente:

ARTICULO 37
EMPLEADOS TEMPOREROS

    1. Empleados Temporeros son aquellos que se contratan para:
        a. llevar a cabo labores de emergencia de no más de noventa (90) días laborables consecutivos, en un período de ciento ochenta (180) días, o
        b. sustituir empleados regulares en el uso de alguna licencia bajo el convenio o
        c. sustituir empleados suspendidos o despedidos mientras se ventila el caso.

    […]

    3. Los empleados temporeros podrán utilizar el procedimiento de querellas dispuesto en el convenio sujeto a las mismas limitaciones que los empleados regulares, y los que trabajen bajo la Sección 1 (a) devengarán un salario de veinticinco ($0.25) centavos por encima del salario mínimo aplicable, y los beneficios

marginales dispuestos por ley; y para los que trabajen bajo las Secciones 1 (b) y (c) devengarán el salario de un empleado de Labor General a nivel de reclutamiento y disfrutará de los beneficios contractuales que el sustituido no esté disfrutando. Los únicos artículos del convenio que aplican a los empleados bajo la Sección 1 (a) son los Artículos 1, 2, 3, 4, 6, 7 (en el sentido de que tienen derecho a estar representados por un delegado u oficial de LA UNIÓN), 8, 9, 10, 11, 26, 31, 34 (la Sección 4 únicamente), 35, 38 y éste. Los únicos artículos del convenio que aplican a los empleados bajo las Secciones 1 (b) y (c) son el 1, 2, 3, 4, 6, 7 (en el sentido de que tienen derecho a estar representados por un delegado u oficial de LA UNIÓN), 8, 9, 10, 11, 12 (únicamente la Sección 3), 20 (a excepción de las Secciones 3, 5, 7, 8 y 9) 22, 25, 26, 27 (excepto las Secciones 4 y 11) 31, 34 (la Sección 4 únicamente) 35, 36 (excepto las Secciones 6, 18, 19, 23, 25, 27, 28, 29 y 31), 38 y éste.

4. El empleado temporero bajo la Sección 1 (b) o (c) será nombrado regular si el sustituido hubiera renunciado, muerto o se hubiera confirmado en forma final su despido, siempre que haya trabajado por lo menos seis (6) meses consecutivos en esa sustitución. De lo contrario, cumplirá los seis (6) meses de período probatorio.

6. Ruiz fue contratado por Cervecera, mediante un Contrato Temporero de Empleo, el 1 de noviembre de 2019.

7. Ruiz suscribió un "Contrato de Empleo Temporero" que dispone que su contrato de empleo es cumpliendo con el Artículo 37 – Empleados Temporeros, sección 1(b).

8. El Exhibit 5 del patrono, titulado Adiestramiento Kister WSP080V y WSP100V, muestra que Ruiz fue adiestrado en la operación de la Kister de lata y la Kister de botella.

9. La máquina Kister es la máquina que utiliza la Compañía para procesar el envasado de las latas y las botellas.

10. Como parte de la operación de la Kister, el operador de la máquina debe "verificar que tiene los materiales necesarios para comenzar la producción y que coinciden con el formato que indica la máquina".

11. El 3 de diciembre de 2019, la línea estaba empacando cerveza medalla de 8 onzas. Sin embargo, el empleado Armando Sáez trajo material

(cartón) equivocado para empacar Medalla de diez (10) onzas.

12. Una vez se trae el material, Ruiz desenrolló, cortó el plástico, quitó las identificaciones y fue él personalmente quien colocó el material equivocado en la máquina Kister.

13. Agnes Escalera, Gerente de Recursos Humanos, presentó durante la vista evidencia de las capturas de imagen de las cámaras de video de la Compañía que muestran a Ruiz colocando el material incorrecto en la máquina Kister.

14. La Sra. Escalera declaró que cuando la Compañía le informó a Ruiz sobre su terminación de empleo, éste le expresó información incorrecta al indicar que no había tocado la mercancía, cuando lo cierto era que de las capturas de imagen de las cámaras de video se confirmaba que él fue quien quitó el plástico de los cartones, el sello de los cartones, identificó el material y alimentó la máquina con el cartón equivocado.

15. Escalera tomó la decisión de despedir a Ruiz a raíz del incidente ya que: (a) Ruiz había sido adiestrado y llevaba un mes en la Compañía; (b) el incidente afectó las operaciones de la Compañía; y (c) la sección 3 del Artículo 6 del Convenio dispone que: "Todo nuevo empleado trabajará con arreglo a las disposiciones de este convenio y será reclutado por un período probatorio de seis (6) meses, durante los cuales LA COMPAÑÍA podrá despedirlo sin ulterior recurso".

16. De igual manera, el Contrato suscrito por Ruiz indicaba que "La Compañía podrá prescindir de los servicios de Luis O. Ruiz Aquino en cualquier momento durante el presente contrato, por cualquiera de las razones que la Compañía considere propio y necesario y que estén contenidos dentro del contrato firmado y/o Convenio Colectivo y/o por ley".

17. Compañía le impartió amonestaciones escritas a Armando Sáez y a Xavier Irizarry porque eran empleados que llevaban varios años en la empresa, no tenían disciplina previa y no fueron los que específicamente colocaron el material equivocado en la máquina, tal y como se estableció durante la vista.

18. El Sr. Ruiz obt[u]vo una puntuación de 88% del examen operacional para operar las máquinas Kister WSP080V (botella) y WSP100V (lata).

19. Las pérdidas sufridas por Cervecera como resultado del incidente del 3 de diciembre de 2019 fueron calculadas en $182.69.[6]

---

[6] SUMAC, Entrada 14 en SJ2021CV06652, págs. 3-7.

En virtud de lo anterior y el Convenio Colectivo vigente entre las partes, así como su derecho aplicable, el TPI resolvió que el análisis e interpretación realizada por el Honorable Árbitro era razonable. A esto añade que, aunque concurre con la Cervecera en cuanto a que el Artículo 6 pudiera aplicar a un empleado temporero, explica que "del propio texto del artículo se establece que el tiempo probatorio le será aplicado a un empleado temporero siempre y cuando ejerza una función como empleado temporero y luego sea nombrado en esa misma posición".[7] De igual manera mencionó que el Artículo 37 del Convenio dispone que a los empleados temporeros les aplica el Artículo 8 pertinente a acciones disciplinarias. Por tal motivo, concluyó que "no surge claramente que todo empleado temporero está sujeto a un término probatorio y puede ser despedido de forma sumaria conforme los propios términos del Convenio Colectivo" y declaró No Ha Lugar la *Solicitud de Revisión de Laudo de Arbitraje*. Inconforme con lo anterior, la Cervecera instó la presente *Petición de Certiorari* y en su escrito expuso los siguientes señalamientos de error:

> ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR QUE LA DETERMINACIÓN DEL ÁRBITRO FUE UNA RAZONABLE MERITORIA DE DEFERENCIA Y CONFIRMAR AL NCA AL DETERMINAR QUE EL DESPIDO DE RUIZ AQUINO FUE INJUSTIFICADO, CUANDO ESTE SE ENCONTRABA EN PERIODO PROBATORIO BAJO EL ARTÍCULO 6 DEL CONVENIO COLECTIVO.

> ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA, IGUAL QUE EL ÁRBITRO, AL NO CIRCUNSCRIBIRSE AL LENGUAJE CLARO DEL CONVENIO COLECTIVO, Y RESOLVER CONTRARIO A LO EXPRESAMENTE PACTADO POR LAS PARTES.

## II

### A

El arbitraje es "la alternativa existente más formal a la adjudicación y [al] litigio judicial"; al acudir a "este proceso, las partes en disputa someten y presentan su caso ante un tercero neutral que está investido con la facultad de rendir una decisión". *C.O.P.R. v. S.P.U.,* 181 DPR 299, 322 (2011), que cita a D. Fernández Quiñones, *El arbitraje obrero-patronal,*

---

[7] SUMAC, Entrada 14 en SJ2021CV06652, pág. 11.

Colombia, Ed. Legis, 2000, pág. 9. Se ha reconocido que "en Puerto Rico existe una vigorosa política pública a favor del arbitraje como método alterno para la solución de disputas y toda duda sobre si procede o no el arbitraje debe resolverse a favor de éste, conforme ha sido pactado." *Constructora Estelar v. Aut. Edif. Púb.,* 183 DPR 1, 30 (2011), que cita a: *Vivoni Farage v. Ortiz Carro*, 179 DPR 990, 1000–1001, 1006 (2010); *S.L.G. Méndez-Acevedo v. Nieves Rivera*, 179 DPR 359, 368 (2010); *Municipio Mayagüez v. Lebrón*, 167 DPR 713, 721 (2006); *Crufon Const. v. Aut. Edif. Púbs.*, 156 DPR 197, 205 (2002); *Medina v. Cruz Azul de P.R.*, 155 DPR 735, 738 (2001); *PaineWebber, Inc. v. Soc. de Gananciales*, 151 DPR 307 (2000); *McGregor-Doniger v. Tribunal Superior*, 98 DPR 864, 869 (1970).

El convenio colectivo es "un 'acuerdo por escrito efectuado entre una organización obrera y un patrono, en el cual se especifican los términos y las condiciones de empleo para los trabajadores cubiertos por el contrato, el estatus de la organización obrera y el procedimiento para resolver las disputas que se susciten durante su vigencia'." *AAA v. UIA*, 199 DPR 638, 648 (2018), que cita a *Cardona Caraballo v. ACT,* 196 DPR 1004, 1012 (2016). Por tanto, "ni el patrono ni los obreros pueden pretender beneficiarse de ciertas cláusulas y rechazar otras", pues "[e]l convenio es un contrato y vincula a ambas partes por igual". 199 DPR 638, a la págs. 650-651, que cita a *San Juan Mercantile Corp. v. J.R.T.*, 104 DPR 86, 89 (1975).

Los convenios colectivos "se rigen por las disposiciones del Código Civil sobre los contratos, a no ser que la ley especial disponga otra cosa." *C.F.S.E. v. Unión de Médicos,* 170 DPR 443, 450 (2007), que cita a *Luce & Co. v. Junta de Rel. Trabajo,* 86 DPR 425, 440 (1962). Tales acuerdos laborales tienen "fuerza de ley entre las partes y debe[n] cumplirse con estricta rigurosidad." 170 DPR, a la pág. 451. Asimismo, "[e]s indubitado el carácter contractual que comporta la figura del arbitraje". *VDE Corporation v. F & R Contractors*, 180 DPR 21,

33 (2010). En Puerto Rico existe una fuerte política que favorece el arbitraje de controversias. 180 DPR  21, a la pág. 36, que cita a *S.L.G. Méndez-Acevedo v. Nieves Rivera*, 179 DPR  359, 368 (2010).

El convenio colectivo y el pacto de sumisión confieren "la autoridad del árbitro para emitir remedios, al igual que su potestad para entender en una controversia". 181 DPR 299*,* a la pág. 373. Cónsono con lo anterior, el Tribunal Supremo de Puerto Rico ha expresado que no es razonable que un árbitro tenga "poder para entender en una controversia entre patrono y unión sin tener autoridad para imponer el remedio que creyera propicio de acuerdo al laudo emitido." 181 DPR 299, a las págs. 373–374 que cita a *Sonic Knitting Industries v. I.L.G.W.U.,* 106 DPR 557, 563–564 (1997).

La doctrina de arbitrabilidad tiene dos vertientes, la sustantiva y la procesal. Es la primera la que atiende "la interrogante de si conforme a los términos del convenio colectivo, las partes han decidido someter a arbitraje una controversia o agravio en particular." *U.G.T. v. Corp. Difusión Púb.,* 168 DPR 674, 684 (2006). Es decir, "si la disputa surgida debe dilucidarse en el proceso de arbitraje." *Id.*  Se ha pautado que "[d]e ordinario y a menos que el convenio colectivo disponga otra cosa, los asuntos de arbitrabilidad sustantiva deben resolverse por los tribunales, pues nadie está obligado a someter a arbitraje una controversia si no lo ha consentido previamente." *Id.*   Así, "la función del tribunal se limita a determinar si las partes pactaron que la controversia fuera resuelta a través del mecanismo de arbitraje y no a resolver la controversia en sus méritos." *Id.,* que cita a *Junta Relaciones de Trabajo v. N.Y. & P.R.S/S Co.,* 69 DPR, 782, 803 (1949).

En el ejercicio de su poder para adjudicar una controversia obrero-patronal, la función de un árbitro es análoga a la ejercida por una sala sentenciadora de primera instancia. *Sonic Knitting Industries v. I.L.G.W.U.,* 106 DPR 557*,* a la pág. 580. Es decir, el arbitraje laboral sustituye el litigio judicial en el sentido de que su fin es la adjudicación. *El Arbitraje Obrero–Patronal,* 1ra ed., Legis Editores, S.A., 2000, pág. 21.  En

cuanto a la revisión apelativa de una sentencia final del Tribunal de Primera Instancia sobre la impugnación de un laudo arbitral del Negociado de Conciliación y Arbitraje, el remedio disponible es el recurso de *certiorari* ante el Tribunal de Apelaciones. *Hospital del Maestro v. Unión de Trabajadores de la Salud*, 151 DPR 934, 942 (2000).

El auto de *certiorari* es un remedio procesal discrecional que permite a un tribunal de mayor jerarquía revisar las determinaciones de un tribunal inferior. *Pueblo v. Díaz de León*, 176 DPR 913, 917 (2009). La Regla 40 del Reglamento del Tribunal de Apelaciones, 4 L.P.R.A. Ap. XXII-B, R.40, enumera los criterios que dicho foro deberá considerar para emitir su decisión de atender o no las controversias que le son planteadas mediante el recurso de *certiorari*, como sigue:

(A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.

(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causa un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

Los foros apelativos deben abstenerse de intervenir con las determinaciones de los tribunales de instancia cuando estén enmarcadas en el ejercicio de la discreción, salvo que se demuestre que hubo un craso abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que la intervención en esa etapa evitará

un perjuicio sustancial. *Lluch v. España Service Sta.*, 117 DPR 729, 745-746 (1986).

En cuanto a la revisión judicial de los laudos de arbitraje, las determinaciones de los árbitros gozan de gran deferencia. *Aut. Puertos v. HEO*, 186 DPR 417, 426-427 (2012), que cita a *Condado Plaza v. Asoc. Emp. Casinos*, 149 DPR 347, 352 (1999) y *J.R.T. v. Junta Adm. Muelle Mun. de Ponce*, 122 DPR 318, 325 (1988). Consistente con dicho estándar de revisión judicial, el Tribunal Supremo de Puerto Rico ha expresado que los tribunales no deben considerar los méritos de un laudo y la revisión "se limitará a las instancias en las cuales quede demostrada la existencia de fraude, conducta impropia del árbitro, falta del debido proceso de ley, ausencia de jurisdicción, omisión de resolver todas las cuestiones en disputa o que el laudo sea contrario a la política pública." 186 DPR 417, 427 (2012), que cita a *C.O.P.R. v. S.P.U.,* 181 DPR 299, 328 (2011). Como excepción a esta norma, si las partes han pactado que se resolverá conforme a derecho, "los tribunales podrán corregir errores jurídicos en referencia al derecho aplicable". 186 DPR 417, a la pág. 427, que cita a *Condado Plaza v. Asoc. Emp. Casinos P.R.*, 149 DPR 347, 353 (1999).

**III**

En su recurso, la Cervecera alega que el tribunal de instancia erró en no revocar el Laudo emitido el 7 de septiembre de 2021. De manera específica, expone que el error del TPI se basó en que este no se circunscribió al lenguaje claro del Convenio Colectivo y como resultado avaló el razonamiento del Honorable Árbitro al determinar que el despido del Sr. Ruiz fue injustificado a pesar de lo dispuesto en el Artículo 6 del Convenio Colectivo. Al respecto, resolvemos a continuación.

Según surge del expediente, el contrato de empleo del Sr. Ruiz estableció expresamente que este era un empleado bajo el Artículo 37 (1)(b), entiéndase un empleado temporero contratado para sustituir a un empleado regular en el uso de alguna licencia. Por tanto, al Sr. Ruiz le son aplicables las disposiciones correspondientes a los empleados temporeros.

Pertinente a la controversia, debemos destacar lo que adicionalmente el Artículo 37 establece en su subinciso 3 y 4:

> 3. [...] **Los únicos artículos del convenio que aplican a los empleados bajo las Secciones 1 (b) y (c) son el 1, 2, 3, 4, 6, 7 (en el sentido de que tienen derecho a estar representados por un delegado u oficial de LA UNIÓN), 8,** 9, 10, 11, 12 (únicamente la Sección 3), 20 (a excepción de las Secciones 3, 5, 7, 8 y 9) 22, 25, 26, 27 (excepto las Secciones 4 y 11) 31, 34 (la Sección 4 únicamente) 35, 36 (excepto las Secciones 6, 18, 19, 23, 25, 27, 28, 29 y 31), 38 y éste.
>
> 4. El empleado temporero bajo la Sección 1 (b) o (c) será nombrado regular si el sustituido hubiera renunciado, muerto o se hubiera confirmado en forma final su despido, siempre que haya trabajado por lo menos seis (6) meses consecutivos en esa sustitución**. De lo contrario, cumplirá los seis (6) meses de período probatorio.** (Énfasis nuestro.)

Adicionalmente, repetimos lo dispuesto en el inciso 3 del aludido Artículo 6, como sigue:

> 3. Todo nuevo empleado trabajará con arreglo a las disposiciones de este convenio y será reclutado por un período probatorio de seis (6) meses, durante los cuales LA COMPAÑÍA podrá despedirlo sin ulterior recurso. **Un empleado temporero que ejerza una posición y luego sea nombrado en esa misma posición se le contará el tiempo trabajado en dicha posición como parte del período probatorio hasta completar los seis (6) meses, durante los cuales LA COMPAÑÍA podrá despedirlo sin ulterior recurso.** Transcurrido dicho término, el empleado pasará a ser permanente y se incluirá en la lista de antigüedad desde la fecha en que comenzó a trabajar para LA COMPAÑÍA. Disponiéndose, además, que si el empleado probatorio fuera suspendido por falta de trabajo antes de cumplir su periodo probatorio, y LA COMPAÑÍA lo llamara a trabajar nuevamente dentro de los próximos noventa (90) días laborables, el tiempo trabajado anteriormente le será incluido como tiempo trabajado, a los fines de computar su periodo probatorio.

Expuesto lo anterior, concluimos que, según el propio lenguaje del Convenio Colectivo, la peticionaria tiene la discreción de despedir a cualquier nuevo empleado sin ulterior recurso únicamente durante los seis

(6) meses de su periodo probatorio. A lo que también establece que para un empleado temporero no se activa el transcurso de un periodo probatorio hasta tanto sea nombrado o contratado como empleado regular. Nada más dispone el Convenio Colectivo de manera particular que a los empleados temporeros, independientemente de que se les active un periodo probatorio, pueden ser despedidos en cualquier momento y por cualquier motivo sin ulterior recurso. Por tal motivo, tanto el Laudo como el TPI recurren a lo establecido en el Artículo 8 acerca de medidas disciplinarias, en aras de compensar la laguna contractual mencionada. A estos efectos, dicho artículo dispone que es aplicable **a cualquier empleado** en caso de que sea suspendido o despedido de empleo y sueldo en forma sumaria, a lo cual razonablemente entendemos aplica a los empleados temporeros con excepción claramente de los empleados que se encuentren en periodo probatorio.

Tomado en consideración lo discutido, colegimos que a la peticionaria no le asiste la razón. Los foros inferiores realizaron un análisis sensato en virtud de lo exclusivamente establecido en el Convenio Colectivo, teniendo en mente no exceder sus facultades y enmendar unilateralmente lo estatuido entre las partes. En cambio, para revocar la determinación de la cual se recurre, tendríamos que hacer interpretaciones que no están contenidas en el convenio e incidir en reescribir el mismo. Por tal motivo, concluimos que no le asiste la razón a la Cervecera y, por consiguiente, que el TPI no cometió los errores señalados.

**IV**

Por los fundamentos anteriormente esbozados, resolvemos expedir el presente auto de *certiorari* y confirmar la decisión recurrida.

**Notifíquese.**

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelacione