Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta, a la cual se une el Juez Asociado Señor Fuster Berlingeri.
Hoy, la Mayoría de este Tribunal resuelve que la jurisdicción para atender la controversia que se generó entre el Plan de Salud de la U.I.A., Inc. y la Autoridad de Acueductos y Alcantarillados le corresponde a la Junta de Relaciones del Trabajo, y no a los tribunales. No podemos suscribir esa conclusión, la cual cierra las puertas de nuestros tribunales a los miembros de la Unión Independiente Auténtica quienes están suscritos a dicho plan de salud, cuya cubierta queda amenazada por la decisión tomada por este Tribunal.
*616 En el caso de autos, el Tribunal de Primera Instancia ordenó a la Autoridad de Acueductos y Alcantarillados (AAA) pagar al Plan de Salud de la UIA, Inc. (Plan) ciertas aportaciones acumuladas en beneficio de los empleados de la AAA suscritos a dicho plan y cumplir con los pagos mensuales al Plan, según acordado entre las partes. El Tribunal de Apelaciones confirmó el injunction emitido por el foro de instancia. Ambos tribunales entendieron que la jurisdicción sobre las controversias suscitadas no le correspondía a la Junta de Relaciones del Trabajo.
Ante nosotros, la AAA plantea nuevamente la cuestión jurisdiccional, que a su vez se deslinda en dos controversias, a saber, si la negativa de la AAA a pagar las primas adeudadas a un plan médico constituye una práctica ilícita para efectos de la jurisdicción exclusiva de la Junta de Relaciones del Trabajo, y si la controversia en torno al pago de las primas es una disputa obrera contemplada por la Ley Núm. 50 de 4 de agosto de 1947 (29 L.P.R.A. sec. 101 et seq.), sobre injunction en disputas obreras, privando así a los tribunales de justicia de su jurisdicción para conceder el remedio extraordinario solicitado. La Mayoría del Tribunal decidió contra nuestra jurisdicción, como resultado de una interpretación del Derecho aplicable que no comparto. Es mi criterio que al interpretar y aplicar las normas jurídicas, los tribunales debemos adoptar una visión pragmática del Derecho, más teleológica y menos propensa a aferrarse a tecnicismos y conceptos abstractos. Desde esa perspectiva, expongo a continuación una interpretación del Derecho aplicable que hubiese permitido hacer justicia en este caso.
HH
La liberalidad y el carácter remedial de nuestra política pública laboral, de estirpe constitucional, se refleja en el interés del Estado en defender y proteger los derechos de *617 los trabajadores a organizarse y a negociar colectivamente. Este esfuerzo, que data desde principios del siglo XX, junto a la transformación de la economía puertorriqueña de una agraria a una industrial, llevó a nuestra Asamblea Legislativa a adoptar un esquema particularizado para resolver las consultas o disputas entre obreros y patronos. Hacia ese fin, antes de nuestra Constitución, se aprobó la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 de 8 de mayo de 1945, según enmendada, 29 L.P.R.A. sees. 62-64 y 65-76. Esta ley procura fomentar la paz industrial mediante la negociación colectiva de los términos y las condiciones de empleo, y eliminar las causas de ciertas disputas obreras creando un tribunal especializado, adecuado y eficaz que implante esa política pública. Art. 1 de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. see. 62(4). Para efectos de la ley, el concepto “disputa obrera” abarca
... cualquier controversia relativa a los términos, tenencia o condiciones de empleo o en relación con la organización o representación de empleados o sobre negociación, fijación, mantenimiento, cambio o esfuerzo para convenir términos o condiciones de empleo, estén o no los disputantes en la relación inmediata de patrono y empleado. 29 L.P.R.A. see. 63(6).
El organismo administrativo cuasi judicial creado para poner en vigor la Ley de Relaciones del Trabajo de Puerto Rico y atender las disputas obreras es la Junta de Relaciones del Trabajo (Junta o JRT). Art. 3 de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. see. 64. La Junta se concibió como una agencia especializada para administrar la política pública establecida específicamente en la Ley de Relaciones del Trabajo de Puerto Rico. Sus funciones primordiales son regular los procedimientos pertinentes a la representación sindical de los trabajadores, fomentar la negociación colectiva y resolver controversias relacionadas con prácticas ilícitas del trabajo, tanto de patronos como de uniones. La Ley de Relaciones del Trabajo *618 de Puerto Rico es una traducción casi literal de la Ley Nacional de Relaciones del Trabajo, conocida popularmente como la Ley ^Wagner de 1935. 29 U.S.C.A. sees. 151 a 169. La diferencia esencial entre ambas leyes estriba en que la de Puerto Rico contiene prácticas ilícitas que la ley federal no contempla.
En términos generales, son prácticas ilícitas aquellas actividades o acciones realizadas por patronos o uniones que interfieren con los derechos a organizarse y a la negociación colectiva de la clase trabajadora. F.S.E. v. J.R.T., 111 D.P.R. 505, 512 (1981). Los cargos por práctica ilícita buscan prohibir que se interfiera, restrinja o coaccione a empleados en el ejercicio de su derecho a llevar a cabo actividades concertadas, a negociar sus condiciones de empleo, a unirse (o no unirse) a una organización obrera para propósitos de una negociación colectiva, o con cualquier otro derecho protegido bajo el palio de la Ley de Relaciones del Trabajo de Puerto Rico. Véase W.B. Gould, A Primer on American Labor Law, 3ra ed., MIT Press, 1993, pág. 45.
En su Art. 8, la Ley de Relaciones del Trabajo de Puerto Rico enumera las actuaciones de un patrono o una unión que constituyen prácticas ilícitas del trabajo. 29 L.P.R.A. see. 69. Entre éstas se encuentra la violación de los términos de un convenio colectivo, ya sea por el patrono o por la unión. En la jurisdicción federal, la facultad de adjudicar una controversia de esta naturaleza pertenece a los tribunales. D. Fernández y C. Romany, Derecho Laboral: Casos y Materiales, Río Piedras, Ed. U.P.R., 1987, T. I, pág. 39.
Hemos resuelto que el convenio colectivo es un contrato, si bien sui géneris, que vincula por igual al patrono, a la unión y a los trabajadores. San Juan Mercantile Corp. v. J.R.T., 104 D.P.R. 86, 89 (1975); Pérez v. Autoridad Fuentes Fluviales, 87 D.P.R. 118, 122 (1963); Luce & Co. v. Junta Rel. Trabajo, 86 D.P.R. 425, 440 (1962). En A.E.E. v. J.R.T., 113 D.P.R. 234, 236 (1982), señalamos que, de ordinario, *619 las obligaciones contractuales entre las partes quedan en suspenso durante una huelga general. El resultado es que durante este periodo de huelga los patronos no pagan los salarios ni los beneficios no devengados acordados en el convenio. En ese caso, resolvimos que la negativa de un patrono, durante un conflicto de huelga, de satisfacer los pagos de licencias por accidentes del trabajo dispuestos por el convenio, equivalía de facto a una violación de los términos del convenio. Llegamos a esta conclusión al entender, en primer lugar, que los pagos de estos beneficios no dependen de que haya trabajo disponible. Además, este derecho se concedía a empleados con status de “regular”, lo cual se determina según periodos de trabajo previamente cumplidos; los beneficios por incapacidad no constituyen pago por servicios contemporáneos y la huelga no es factor relevante para el cese de estos beneficios, ya que su quid pro quo no es propiamente que el empleado realice la labor. A.E.E. v. J.R.T., supra, pág. 237.
No obstante lo anterior, por muchos años fue práctica generalizada y aceptada que durante un periodo de huelga o al vencimiento de un convenio, y mientras duraba el proceso de negociación de un nuevo convenio, los patronos unilateralmente suspendían los pagos de ciertos beneficios, en particular los otorgados en concepto de seguros o planes médicos de los trabajadores. En respuesta a esta situación y a lo resuelto por este Tribunal enA.E.E. v. J.R.T., supra, la Asamblea Legislativa tomó la determinación de enmendar la Ley de Relaciones del Trabajo de Puerto Rico. Así, por medio de la Ley Núm. 97 de 15 de julio de 1988 se estableció como práctica ilícita del trabajo el que un patrono “suspenda o demuestre la intención de suspender los pagos por concepto de seguros y planes médicos de los empleados y dependientes de éstos, mientras se esté negociando un nuevo convenio colectivo o durante una huelga ...”. Art. 8(l)(k) de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 69(l)(k). De esa forma, se reconoció que es *620 de alto interés público “proteger la salud de los trabajadores por medio de un seguro razonable que mitigue los altos costos de los servicios médicos ..Comisión de Trabajo y Asuntos de Veteranos de la Cámara de Representantes de Puerto Rico, Informe sobre P. de la C. 1089, 1987, pág. 2. Por eso, esta medida legislativa procuraba que el patrono mantuviese un plan médico durante una huelga o un proceso de negociación de un nuevo convenio colectivo, asegurándole así a los trabajadores un acceso adecuado a los servicios de salud. Además, uno de los propósitos principales de este nuevo supuesto de práctica ilícita es evitar que el patrono utilice el derecho gremial de los trabajadores a un plan de salud como una medida de presión indebida contra la unión. Comisión de Trabajo del Senado de Puerto Rico, Informe sobre el P. del S. 1081, 1987, págs. 4-6. Al incluir la suspensión del pago del plan médico durante una huelga o una negociación de convenio como práctica ilícita, se garantizó que los trabajadores siempre tuvieran a su disposición un seguro médico suficiente para acceder a los servicios de salud que necesitaran.
La Ley de Relaciones del Trabajo de Puerto Rico dispone que la JRT tendrá la jurisdicción exclusiva para dilucidar controversias relacionadas con prácticas ilícitas del trabajo, y que dicha facultad no se verá afectada por otro medio de ajuste o prevención, salvo circunstancias especiales. Art. 7 de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 68(a). Por medio de esta ley, se sustrajo esta facultad de la jurisdicción ordinaria de los tribunales y se le otorgó a la Junta para que la ejerza en su función de garantizar y hacer efectivos los derechos de los trabajadores. F.S.E. v. J.R.T., supra, pág. 513. De igual forma, al incluir entre las prácticas ilícitas la suspensión de un plan médico durante un conflicto de huelga o una negociación, se otorgó a la Junta jurisdicción exclusiva para atender las controversias que se suscitaran respecto a esto.
*621 Sin embargo, el deslinde jurisdiccional entre la Junta y el foro judicial no siempre es claro. Las controversias entre partes inmersas en una relación laboral no siempre se presentan nítidamente como disputas estrictamente laborales. Por el contrario, algunas presentan una imbricación de derechos y remedios de tal naturaleza que se requiere dilucidar, de entrada, el foro que debe asumir jurisdicción sobre el asunto. A esos efectos, hemos distinguido entre el derecho privado y el derecho público que puede emanar de situaciones conflictivas sobre los convenios colectivos o de controversias de naturaleza laboral. Asoc. de Guardianes v. Bull Line, 78 D.P.R. 714, 720 (1955). Los derechos públicos son aquellos que emanan de la ley, que obligan e imponen ciertos deberes imperativos a la sociedad. Los individuos se obligan a éstos de forma involuntaria, ya que no requieren el consentimiento de los obligados. En cambio, los derechos privados son aquellos que se basan en el principio de la autonomía y en el consentimiento; son las obligaciones y las consecuencias legales que proceden de una acción voluntaria. Los derechos privados requieren un consentimiento a obligarse y a asumir estas transacciones voluntarias. En el campo laboral, los convenios colectivos son materia de derecho público. Aun cuando la voluntariedad y el consentimiento están presentes, la ley impone a las partes la obligación de negociar hasta que lleguen a un acuerdo, y en cierta medida regula las materias sobre las que pueden tratar. Véase Steelworkers v. Warrior & Gulf Co., 363 U.S. 574, 580 (1960).
La Ley de Relaciones del Trabajo de Puerto Rico establece ciertos imperativos que obligan a las partes en una relación obrero-patronal, con el propósito de garantizar y proteger los derechos públicos de la clase trabajadora de Puerto Rico. Principalmente, esta ley refleja los preceptos constitucionales que protegen el derecho de los trabajadores a organizarse y a negociar colectivamente sus términos *622 y condiciones de empleo. Por lo tanto, la política pública cristalizada en esta ley es la de promover la solución de disputas obreras para asegurar el libre ejercicio de estos derechos, que están revestidos de un claro interés público. Esta ley impone obligaciones que no dan lugar a la discreción de las partes en una disputa obrera. El derecho público contenido en la ley obliga sin más y requiere de mecanismos que aseguren su más fiel cumplimiento. Tomando esto en consideración, desde 1955 hemos resuelto que la Junta tiene jurisdicción exclusiva para proteger y asegurar el derecho público contenido en la Ley de Relaciones del Trabajo de Puerto Rico. Sin embargo, esto no impide necesariamente que ciertos pleitos sean atendidos por los tribunales cuando involucren intereses privados.
En Asoc. de Guardianes v. Bull Line, supra, pág. 720, resolvimos que la jurisdicción exclusiva de la Junta sobre el derecho público no impide que los empleados inicien en los tribunales unas acciones para proteger sus intereses y derechos privados. Por lo tanto, interpretamos que la Ley de Relaciones del Trabajo de Puerto Rico no sustrajo de la jurisdicción de los tribunales la litigación sobre asuntos de interés privado de las partes en una disputa laboral. Véase United Steelworkers v. Paula Shoe Co., Inc., 93 D.P.R. 661, 668 (1966). Posteriormente, en U.T.I.E.R. v. J.R.T., 99 D.P.R. 512, 527-528 (1970), reiteramos que “la Junta no administra derecho privado sino derecho público. Sus funciones son estrictamente las de realizar los propósitos públicos de la Ley de Relaciones del Trabajo y sus órdenes van dirigidas a vindicar el interés público y no intereses privados”.
Ahora bien, el que los tribunales tengan jurisdicción en los asuntos privados dimanantes de una controversia entre las partes que están inmersas en una disputa laboral, no impide que la Junta resuelva aquellos asuntos que sean propiamente de interés público y que se deriven de la ley *623 orgánica de la JRT. No hay duda, pues, que la Junta tiene jurisdicción exclusiva en asuntos de interés público, esto es, en aquellos protegidos por las disposiciones de la Ley de Relaciones del Trabajo de Puerto Rico, como lo sería un cargo de práctica ilícita o una controversia sobre elecciones sindicales o de actividades concertadas de las uniones. No obstante, los tribunales conservamos jurisdicción para en-tender en los derechos o asuntos privados que se deriven de estas controversias. Lo determinante es si la naturaleza de los intereses en pugna o el remedio solicitado se relaciona directamente con los derechos protegidos por la Ley de Relaciones del Trabajo de Puerto Rico, y si la controversia que debe resolverse es esencialmente una disputa laboral. Si la controversia se refiere a derechos públicos y a condiciones y términos de empleo, será una “disputa laboral” sobre la cual la Junta tendrá jurisdicción exclusiva; si, en cambio, la controversia versa sobre intereses privados, no necesariamente será una “disputa obrera”, en cuyo caso los tribunales tendrán jurisdicción para resolverla.
En aquellos asuntos en los cuales la Junta de Relaciones del Trabajo tiene jurisdicción exclusiva, su función es de carácter cuasi judicial. En el ejercicio de su poder adjudicativo sobre cargos de prácticas ilícitas, la Junta tiene amplias facultades investigativas; puede expedir citaciones, tomar juramentos, examinar testigos y recibir toda prueba que sea necesaria para atender cualquier asunto o controversia que tenga ante su consideración. Art. 7 de la Ley de Relaciones del Trabajo de Puerto Rico, supra. También, dentro de su poder investigativo, la Junta puede requerirle a otras agencias e instrumentalidades del Gobierno que le suministren expedientes, documentos e informes relacionados con cualquier asunto ante su consideración. íd. En la vista que se celebre, la Junta puede permitir la intervención de cualquier persona o entidad que así lo solicite, para recibir prueba relacionada *624 con la controversia que debe resolver. Art. 9 de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 70.
La Ley de Relaciones del Trabajo de Puerto Rico, en su Art. 9(l)(b), 29 L.P.R.A. sec. 70(l)(b), también faculta a la Junta para expedir órdenes dirigidas a cualquier persona, patrono u organización obrera, “requiriéndole que cese en y desista de [cualquier] práctica ilícita de trabajo y tome tal acción afirmativa que permita efectuar los propósitos de [esta ley] ...”. Entre éstas, la Junta podrá ordenar
... la reposición de empleados, abonándose o no la paga suspendida, fijando o remitiendo por correo los avisos apropiados, y poniendo fin a convenios colectivos, en todo o en parte, o cualquier otra orden contra tal persona, patrono, parte u organización obrera, que permita efectuar los propósitos de [esta ley], 29 L.P.R.A. sec. 70(b).
Con respecto a esta facultad de emitir órdenes, hemos señalado: “[l]a norma o límite legislativo que la Asamblea Legislativa impuso a la Junta sobre este particular es que el remedio ordenado vaya dirigido a efectuar los propósitos de la ley.” (Énfasis suplido.) U.I.T.E.R. v. J.R.T., supra, pág. 526. Por lo tanto, al igual que sucede con su jurisdicción sobre disputas obreras, la discreción que la ley le concede a la Junta para conceder remedios no es ilimitada, sino que se circunscribe a proteger los derechos públicos. No es su función garantizar ni adjudicar intereses privados.
II
En el mismo contexto de política pública de protección a la clase trabajadora, la Asamblea Legislativa aprobó la Ley Núm. 50, supra, mejor conocida como Ley de Injunctions en Disputas Obreras. La Ley Núm. 50 fue aprobada para limitar la jurisdicción de los tribunales para expedir órdenes de entredicho o de injunction en casos que involucren o surjan de una disputa obrero-patronal. Art. 1 de la Ley *625 Núm. 50 (29 L.P.R.A. sec. 101). Véase, además, J.R.T. v. UTAMA, 92 D.P.R. 373 (1965). Debido a que se usó como modelo a su homologa federal, a esta ley también se le conoce como la “pequeña Norris-La Guardia”.
La ley federal Norris-La Guardia se aprobó para evitar que las acciones interdíctales se utilizaran para entorpecer y restringir las acciones y actividades de los trabajadores organizados en el ejercicio de sus derechos.(1) En ausencia de una expresión legislativa en el historial del proyecto que dio lugar a la Ley Núm. 50, supra, concluimos que ésta responde a una política pública igual a la que dio lugar a la Ley Norris-La Guardia, 29 U.S.C. sees. 101-115. Véase El Imparcial, Inc. v. Brotherhood, etc., 82 D.P.R. 164, 173 esc. 2 (1961). Se trata, por lo tanto, de una legislación remedial que, al igual que toda legislación laboral, debe interpretarse liberalmente para cumplir con sus propósitos reparadores a favor de la clase trabajadora. Véase Muñoz Hernández v. Policía de P.R., 134 D.P.R. 486, 495-496 (1993). El propósito de la referida Ley Núm. 50 es evitar la intervención de los tribunales en perjuicio de la clase trabajadora y de las organizaciones que los representan cuando éstas lleven a cabo actos legítimos en el ejercicio de sus derechos durante los conflictos obrero-patronales.
El Art. 2 de Ley Núm. 50 dispone expresamente que:
Ningún tribunal de justicia de Puerto Rico tendrá jurisdicción para expedir orden alguna de entredicho o de injunction *626 preliminar o permanente en caso alguno que envuelv[a o] que surja de una disputa obrera para prohibir a una persona o personas participantes o interesadas en dicha disputa, a que hagan individual o concertadamente cualesquiera de los actos siguientes .... (Énfasis suplido.) 29 L.P.R.A. see. 102.
La ley procede entonces a enumerar una serie de actos que los tribunales no pueden prohibir mediante el recurso de injunction. Entre éstos se encuentran los siguientes:
Pagarle, darle o retenerle a cualquier persona participante o interesada en dicha disputa obrera, cualesquiera beneficios, seguro de huelga, u otro dinero o cosa de valor. (Énfasis suplido.) 29 L.P.R.A. sec. 102(c).
De esta manera, la Ley Núm. 50, supra, privó a los tribunales de jurisdicción para conceder injunction, prohibiendo a las partes en una disputa obrera realizar individual o concertadamente los actos descritos en esta disposición, salvo los permitidos de manera restrictiva por la ley.(2) El Imparcial, Inc. v. Brotherhood, Etc., supra, pág. 173. El historial legislativo de la ley federal que fue modelo para la nuestra revela que la intención de esta prohibición *627 es evitar la intromisión judicial por medio de órdenes interdíctales que entorpezcan o menoscaben las actividades legítimas de los obreros. Concluimos que, al igual que su homologa federal, la Ley Núm. 50, supra, es una ley de vanguardia que busca proteger las actividades concertadas de los obreros de toda intervención judicial que resulte en su perjuicio. Como bien estableciera el Tribunal Supremo de Estados Unidos, “[l]a Ley Norris-La Guardia ... expresa una política pública básica contra los interdictos de actividades de uniones laborales”. (Traducción nuestra.) Machinists v. Street, 367 U.S. 740, 772 (1961). Lo mismo podemos decir de la ley anti injunction puertorriqueña.
Uno de los puntos neurálgicos de la referida Ley Núm. 50 es que restringe la intervención judicial en casos “que envuelvafn] o sur[jan] de una disputa obrera ...”. 29 L.P.R.A. sec. 109(a). Al igual que su contraparte federal, la Ley Núm. 50 ofrece una definición abarcadora de lo que es “disputa obrera” en aras de adelantar los propósitos estatutarios de protección a las actividades concertadas. Véase, por ejemplo, New Negro Alliance v. Grocery Co., 303 U.S. 552 (1938). La Ley Núm. 50, supra, define “disputa obrera” en los términos siguientes:
(a) Se considerará que un caso envuelve o surge de una disputa obrera cuando dicho caso envuelve a personas dedicadas a la misma industria, oficio, arte manual u ocupación; o que tienen interés directo o indirecto en los mismos; o que sean empleados del mismo patrono; o miembros de la misma organización de empleados o patronos, o de alguna organización afiliada a la misma; bien sea dicha disputa:
(1) Entre uno o más patronos o asociaciones de patrono y uno o más empleados o asociaciones de empleados;
(2) entre uno o más patronos o asociaciones de patronos y uno o más patronos o asociaciones de patronos, o
(3) entre uno o más empleados o asociaciones de empleados y uno o más empleados o asociaciones de empleados; o cuando el caso envuelve cualesquiera intereses conflictivos o en pugna en una disputa obrera de personas participantes o interesadas en la misma.
*628 (b) Se considerará que una persona o asociación es participante o está interesada en una disputa obrera si se solicita recurso contra dicha persona o asociación, o si cualquiera de éstas se dedica a la misma industria, oficio, arte manual u ocupación en que ocurra dicha disputa, o tiene interés directo o indirecto en la misma, o es miembro, funcionario o agente de cualquier asociación compuesta total o parcialmente de patronos o empleados dedicados a tal industria, oficio, arte manual u ocupación.
(c) El término disputa obrera incluye cualquier controversia relativa a término o condiciones de empleo o relativa a la asociación o representación de personas al negociar, fijar, mantener, cambiar, o tratar de llegar a un acuerdo sobre términos o condiciones de empleo, aunque las partes se encuentren o no en la relación inmediata de patrono y empleado.(3) 29 L.P.R.A. see. 109.
El lenguaje de esta disposición permite considerar como “disputa obrera” cualquier conflicto que implique de cierta manera las actividades concertadas legítimas de trabajadores o uniones obreras. No obstante, se requiere que la disputa sea acerca de términos o condiciones de empleo, el derecho de asociación de los trabajadores o de negociación colectiva, entre otras cosas.(4) Cabe destacar que se desprende de la Ley Núm. 50, supra, que para ser cualificar como disputa obrera, la controversia debe involucrar los *629 derechos públicos protegidos por las leyes y la política laboral de Puerto Rico. Por lo tanto, en aquellas situaciones que presenten una imbricación de derechos e intereses privados con los derechos públicos tutelados por la ley, los tribunales tienen plena jurisdicción para resolver, respecto a los primeros, las controversias presentadas y proveer los remedios que sean necesarios, incluso el de emitir un injunction. De no estar en conflicto los derechos públicos protegidos por las leyes laborales, los tribunales conservarán su jurisdicción ordinaria para proteger los intereses privados en pugna. En estos casos la controversia sería de naturaleza privada, por lo cual no sería una “disputa obrera” para efectos de la Ley Núm. 50, supra. En otras palabras, siempre y cuando no se trate de “término [s] o condiciones de empleo o relativa a la asociación o representación de personas al negociar, fijar, mantener, cambiar, o tratar de llegar a un acuerdo sobre términos o condiciones de empleo” (29 L.RR.A. see. 109), o que implique aquellos derechos públicos protegidos por las leyes laborales o por las Secs. 16, 17 y 18 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, estaremos ante una controversia privada, sujeta a la jurisdicción de los tribunales de justicia.
hH h-1 i—1
En sus escritos, la AAA se refiere constantemente a la imbricación entre la Unión Independiente Auténtica (Unión) y el Plan y arguye que ambos funcionan bajo una misma administración. Por eso, antes de aplicar el marco jurídico descrito a la controversia de autos, es necesario aclarar si el Plan es, en efecto, una entidad independiente.
Veamos primeramente la relación entre el Plan y la Unión. No hay duda de que el Plan fue producto, en su origen, de una negociación colectiva entre la AAA y la Unión. No obstante, en noviembre de 1993 el Plan se in *630 corporó en el Departamento de Estado como una corporación con fines no pecuniarios bajo la Ley General de Corporaciones de Puerto Rico. Además, en 1994 fue autorizado y certificado por la Oficina del Comisionado de Seguros (OCS) para operar como una organización de servicios de salud conforme las disposiciones del Código de Seguros de Puerto Rico. Su propósito es brindar servicios de cuidado de salud a los empleados y ex empleados de la AAA que sean miembros de la Unión Independiente Auténtica de la AAA.
El establecimiento de planes médicos por medio de la negociación colectiva en beneficio de empleados no es una innovación reciente. Ya desde sus inicios, durante la era de la industrialización, las uniones y los sindicatos operaban planes de asistencia y de beneficencia a favor de sus miembros. Sin embargo, no es hasta principios del siglo XX que los patronos comienzan a ofrecer la disponibilidad de un seguro médico como beneficio marginal a un empleo. Inicialmente, estos seguros se establecían mediante la creación de fondos o fideicomisos administrados por comités conjuntos compuestos por representantes de la unión y del patrono. En otras instancias, el patrono ofrecía un seguro médico bajo su propia administración y control, alternativa que no contaba con el apoyo de las uniones porque no les permitía participar en la administración del plan. También surgieron los planes de las uniones costeados por el patrono, pero éstos usualmente se enfrentaban a dificultades financieras al no contar con los fondos suficientes para asegurar su funcionamiento y administración. De esa forma, según fue creciendo la industria de los seguros, se convirtió en una práctica usual que en los convenios colectivos se pactara para el pago de un plan médico provisto por una compañía aseguradora, dedicada enteramente a esta industria, independiente de ambas partes y ajena a la relación obrero-patronal. En la mayoría de estos planes adquiridos por medio de una negociación colectiva se requiere *631 que los empleados sean miembros de una unión determinada para participar de los servicios de la cobertura. Este requisito es común, tanto en planes administrados por aseguradoras comerciales como en los que son administrados por una unión o por el patrono. Véase, en general, Union Contract Clauses, Chicago, Commerce Clearing House, 1954, Sec. 51,376, págs. 387-392.
La industria del seguro en Puerto Rico está regulada por el Código de Seguros. La empresa que interese operar como una aseguradora de servicios de salud tiene que cumplir con las disposiciones del Capítulo 19 del Código de Seguros, 26 L.P.R.A. sees. 1901-1927, y solicitar un certificado de autoridad del Comisionado de Seguros. Una vez autorizado a funcionar como asegurador de servicios de salud, el Código de Seguros y la Ley General de Corporaciones le reconocen a estas organizaciones una personalidad jurídica especial. En virtud de ello, una organización que funciona como plan médico tiene personalidad jurídica propia y opera de manera independiente de cualquier otra entidad. Además, como corporación certificada y autorizada a funcionar como organización de servicio de salud, un plan médico está sujeto a inspecciones regulares del Departamento de Salud y a cumplir con todas las exigencias de la Oficina de la Comisionada de Seguros.
El Plan es una corporación sin fines de lucro certificada para operar como una organización de servicios de salud conforme al Código de Seguros de Puerto Rico. A diferencia de los planes sindicales o patronales, este seguro médico se organizó conforme lo requiere el Código de Seguros y fue certificado por la OCS para operar como una organización dedicada al negocio de seguros de salud. Este plan no funciona como un fideicomiso de fondos cuya existencia depende de las disposiciones de un convenio colectivo que establezca la formación de un fondo y su administración. Tampoco depende de la subcontratación de una aseguradora comercial para ofrecer sus servicios. Por el contrario, *632 el Plan cuenta con Artículos de Incorporación y con un Reglamento Corporativo propio para regir la administración de la corporación y de sus fondos. Además, ofrece sus servicios directamente con los proveedores médicos, sin necesidad de que una compañía comercial le sirva de intermediaria. El hecho de que el Plan ofrezca sus servicios sólo a los miembros de la Unión no impide el reconocimiento pleno de su personalidad jurídica, pues la eligibilidad limitada de los beneficiarios no es contraria al mercado de los seguros.(5) Por lo tanto, el Plan es una aseguradora de servicios de salud para efectos del Código de Seguros y debe ser reconocido como tal.
En nuestro ordenamiento, la personalidad jurídica de una entidad implica su reconocimiento por parte del Estado como sujeto de derecho. La AAA no nos ha provisto fundamentos concretos que ameriten hacer caso omiso de la personalidad jurídica propia e independiente que el Código de Seguros y la Ley General de Corporaciones le confieren al Plan. La realidad es que la AAA ha reconocido durante años la personalidad jurídica del Plan. Hace más de diez años que la AAA paga al Plan las primas acordadas e, incluso, incluyó al Plan como proveedor legítimo de seguro médico en el convenio colectivo con sus empleados. Además, la AAA firmó voluntaria y conscientemente, en junio de 2005, el Documento Aclaratorio en el cual no sólo reconoce la personalidad jurídica independiente del Plan, sino que se compromete directamente con éste a realizar *633 ciertos pagos, con la reserva de que el Plan, a su vez, cumpla con ciertas condiciones. También pactó expresamente que los pagos se harían directamente al Plan, no a través de la Unión.
Tampoco podemos ignorar que la AAA acordó directamente con el Plan ciertos asuntos relacionados con su administración. Según estos acuerdos, que están contenidos en un anejo a la estipulación de diciembre de 2004, la AAA tendría representación en la Junta de Directores del Plan, y dicha junta sería dirigida por una persona que no estuviese relacionada ni con la Unión ni con la AAA.(6) Esa persona resultó ser Monseñor Roberto González, Arzobispo de San Juan. De esa forma, la propia AAA, es decir, el patrono, tiene representación en la Junta de Directores, y quien preside dicha junta es un tercero nombrado por acuerdo entre las partes.
Lo anterior nos lleva a concluir que el Plan es una organización que funciona separada e independientemente de la UIA y de la AAA,(7) aun cuando los servicios que preste sean exclusivamente para empleados de este patrono y miembros de esa unión. No hay nada en los autos ante nuestra consideración que lleve a concluir que el Plan y la UIA son o funcionan como una misma entidad. Las alegaciones, sin prueba, de la AAA no son suficientes para descartar la personalidad jurídica independiente del Plan.
*634 Otro fundamento importante formulado por la AAA para sustentar su alegación de falta de jurisdicción es que su relación con el Plan es de naturaleza laboral. Aduce respecto a esto que el Plan, y las obligaciones de la AAA para con éste, provienen del convenio, producto de la negociación colectiva entre la AAA y la Unión.
Ciertamente, el derecho de los empleados de la AAA a un seguro médico nace del convenio colectivo negociado entre la Unión y el patrono. Además, en la Estipulación firmada por la Unión y la AAA, éstos acordaron que los unionados podían elegir entre “el Plan Médico de la UIA, Inc. o el Plan Médico Triple S”.(8) Se trata de acuerdos que sólo consideran asuntos de naturaleza obrero-patronal entre la Unión y la AAA; ni el Plan ni el plan médico Triple S participaron en las negociaciones que produjeron estos acuerdos ni los firmaron. Evidentemente, el que se haya incluido al Plan y a Triple S en estos acuerdos como opciones de seguro médico, no puede implicar que la relación establecida entre el Plan y la AAA, o entre Triple S y la AAA, tenga carácter obrero-patronal.
El Documento Aclaratorio, en el cual la AAA se compromete a pagar las aportaciones adeudadas al Plan y a reanudar el pago de aportaciones sujeto a la auditoría de la OCS, fue suscrito por la Unión, la AAA y el Plan.(9) La AAA *635 alega que este documento, en el cual cada firmante asumió ciertas obligaciones respecto a los otros, es complementario a la estipulación anterior, que recogió los acuerdos producto de la negociación laboral entre la AAA y la Unión. De ahí que su relación con el Plan sea también laboral.
No hay duda que los acuerdos entre la AAA y la Unión son de índole laboral, pero ello no convierte la relación entre la AAA y el Plan en una de este tipo. Lo cierto es que el contenido del Documento Aclaratorio y los acuerdos allí plasmados revelan lo contrario. En lo que a la AAA y al Plan se refiere, el Documento Aclaratorio precisa cuándo y bajo qué condiciones la AAA desembolsará los pagos debidos al Plan por los servicios que éste provee a los miembros de la Unión. La participación del Plan en ese documento fue únicamente a los efectos de comprometerse a cumplir con ciertas condiciones requeridas por la AAA para poder recibir las aportaciones en concepto de primas que permiten su funcionamiento como organización de servicios de salud. El contenido del Documento Aclaratorio lleva ineludiblemente a la conclusión de que el Plan comparece como un tercero en lo que se refiere a la relación obrero-patronal *636 entre la AAA y la Unión. Se trata, pues, de un esquema contractual que es en parte laboral, en lo que se refiere a los acuerdos entre la AAA y la Unión, y en parte privado, en cuanto a los acuerdos entre la AAA y el Plan. Nuestro ordenamiento, que está basado en el principio de la libertad de contratación, no prohíbe esta forma de contratación múltiple, aunque la mejor práctica sería plasmar estas distintas relaciones obligacionales en documentos separados.
Habiendo aclarado de umbral estos puntos medulares, examinaremos a continuación los señalamientos de la AAA y las razones que apoyan nuestro voto disidente a la decisión de la Mayoría del Tribunal.
IV
Veamos primeramente el asunto jurisdiccional. Como indicamos anteriormente, la Junta es el organismo con jurisdicción exclusiva para atender los cargos de práctica ilícita, y entre las prácticas ilícitas contenidas en la Ley de Relaciones del Trabajo de Puerto Rico se encuentra la suspensión por el patrono de los pagos correspondientes a un seguro médico para los empleados durante una huelga o la negociación de un nuevo convenio. Por el texto y la intención de la ley, esta práctica ilícita se refiere, específicamente, a la situación en que un patrono niegue a sus empleados la disponibilidad del plan médico, mediante la suspensión o la intención de suspender los pagos en concepto de primas.
La AAA no ha negado a sus empleados la disponibilidad de un plan médico. Por el contrario, durante la huelga y el proceso de negociación colectiva, los miembros de la Unión no han estado desprovistos de un seguro médico. El Plan ha estado brindando sus servicios a los unionados durante todo este proceso; además, el patrono ofrece la oportunidad a sus empleados de acogerse al seguro médico de la Triple *637 S. El asunto traído ante la consideración de este Tribunal no es, pues, el impago de un plan médico a los empleados, sino el incumplimiento de la AAA con una obligación de pago contraída contractualmente con una aseguradora independiente, el Plan. La AAA le está pagando las aportaciones que debe a Triple S, pero no las que debe al Plan, a pesar de haberse comprometido a hacerlo mediante contrato. En otras palabras, la controversia no es si el patrono está pagando un plan médico a sus empleados, sino si está justificado en suspender unilateralmente el pago que acordó hacer a un plan en particular por servicios que se están prestando a los suscriptores de dicho plan, esto es, a los empleados de la AAA que optaron por el Plan. No se trata de la suspensión de los servicios de un plan médico provocado por un patrono en el fragor de una negociación con la Unión, sino del incumplimiento de una obligación contractual asumida por una corporación pública con una aseguradora médica.
Contrario a lo que alega la AAA, la Junta no tiene jurisdicción exclusiva en el caso de autos. Según explicamos, la Junta atiende asuntos que involucren los derechos públicos contenidos en su ley orgánica. La acción presentada por el Plan constituye un pleito privado en cobro de dinero. El Plan no intenta vindicar los derechos públicos de los unionados, porque el patrono no le ha negado a los empleados la disponibilidad de un plan médico. La controversia presentada ante los tribunales es si el Plan había cumplido con las obligaciones contraídas, cuyo cumplimiento era, a su vez, la condición para activar la obligación de la AAA de pagarle lo que le debía por los servicios provistos. El Plan reclama el cobro de una deuda líquida y exigible por los servicios que ha prestado y que presta a los empleados de la AAA. Se trata, por lo tanto, de un pleito para reclamar los intereses y derechos privados de una organización de servicios de salud que busca que se le compense por los servicios que provee a sus suscriptores.
*638 La prueba contenida en los autos del caso, la cual fue creída tanto por el Tribunal de Primera Instancia como por el Tribunal de Apelaciones, indica que el Plan cumplió con aquello a lo que se obligó ante la AAA en el Documento Aclaratorio. Sólo resta determinar si la AAA está obligada a cumplir con lo allí acordado. Por consiguiente, resolvería que en el caso de autos no está en controversia la comisión de una práctica ilícita, sobre la cual sólo la Junta tendría jurisdicción, sino el incumplimiento de la AAA con el pago de una deuda. Así, la acción del Plan corresponde a una reclamación en cobro de dinero motivada por el incumplimiento de la AAA con una obligación de pago voluntariamente asumida.
No se nos ha planteado que la Junta tenga ante sí una querella por práctica ilícita promovida por los unionados acogidos al Plan y, aunque la tuviese, ello no sería impedimento al ejercicio de nuestra jurisdicción para atender los intereses privados ínsitos en está controversia.(10) Tampoco estaría facultado el Plan para promover su reclamación ante la Junta. Como parte ajena a la relación laboral, el Plan sólo puede intervenir si la Junta lo autoriza, una vez comenzado un procedimiento de querella, y entonces, según dispone la Ley de Relaciones del Trabajo de Puerto Rico, con el único propósito de aportar prueba relacionada a la práctica ilícita alegada, no el de reclamar la reivindicación de sus intereses privados. El asunto ante nuestra consideración requiere la participación plena del Plan como parte realmente afectada y con interés sobre lo que se resuelva en su día. Ello no sería posible en un procedimiento ante la Junta. La resolución de esta controversia *639 también requeriría la participación extensa de la OCS y la posibilidad de ordenar a esta oficina que asuma un rol fiscalizador sobre el Plan, para lo cual la Junta no tiene facultad. Conforme a esto, la Junta tampoco podría implantar las medidas correctivas emitidas por la OCS. El rol que ha ejercido la OCS a lo largo de este proceso es muestra de cuán importante ha sido su intervención, la cual ha sido ampliada a instancias de este Tribunal.(11)
Las razones que ha formulado la AAA para no cumplir con su obligación no se relacionan a su disputa obreropatronal con la UIA, sino a un alegado incumplimiento del Plan con las disposiciones estatutarias que regulan el mercado de los seguros. Esto evidentemente está fuera del conocimiento especializado de la Junta. La Junta no tiene facultad sobre las operaciones de un plan médico ni sobre cómo funciona un sistema basado en primas por servicios de proveedores médicos. Ante lo planteado, se requiere un análisis basado en nuestro derecho de seguros para determinar si el Plan está operando adecuadamente y si ha cumplido con la obligación asumida en el Documento Aclaratorio. Somos los tribunales los llamados a resolver esta controversia.
Por otra parte, no debemos propiciar que un patrono tenga la plena libertad de calificar sus propios actos como práctica ilícita, sin que se haya presentado imputación alguna en ese sentido, con el propósito de determinar, a su conveniencia, el foro que tendrá jurisdicción sobre una con *640 troversia y así evadir la jurisdicción del tribunal. Por consiguiente, contrario a la conclusión a la que llega este Tribunal, resolvería que el foro apelativo no erró al concluir que la negativa de la AAA de pagarle al Plan las aportaciones adeudadas no es materia de la jurisdicción exclusiva de la Junta.
En cuanto a las alegaciones de la AAA de que el tribunal estaba impedido de emitir un injunction preliminar en su contra por razón de la Ley Núm. 50, tampoco tiene razón. Como vimos, la Ley Núm. 50, supra, limita la jurisdicción de los tribunales para emitir interdictos en casos que “envuelva[n] o suija[n] de una disputa obrera”. 29 L.P.R.A. sec. 101. En otras palabras, la ley limita la jurisdicción interdictal de los tribunales solamente cuando se trate de casos que involucren o provengan de una disputa obreropatronal. La ley defíne “disputa obrera” de manera abarcadora, pero siempre dentro del marco de una controversia relativa a términos o condiciones de empleo “y a la asociación o representación de personas al negociar” sobre éstos. Es en ese contexto que aclara que las partes no necesariamente tienen que estar “en la relación inmediata de patrono y empleado”. 29 L.P.R.A. sec. 109(c). La amplitud de esta definición, por lo tanto, tiene como objetivo la protección de aquellos terceros, sean personas, empleados, asociaciones, organizaciones afiliadas u otras uniones, entre otras, que en ocasiones participan en las actividades concertadas de las uniones en ayuda mutua. De esa forma, la inclusión en el concepto disputa obrera de terceros, que no están en una relación propiamente laboral con un patrono, se limita a aquellos que participan en el conflicto de forma legítima para asegurar el libre ejercicio del derecho de asociación, de expresión y de negociación colectiva en las actividades concertadas de las uniones interesadas directamente en la disputa.
El Plan no es parte en la relación obrero-patronal entre la Unión y la AAA ni en el Convenio Colectivo acordado por *641 ésta, ya que no es empleado de la AAA ni representa a los miembros de la Unión. Además, como antes indicara, la reclamación del Plan persigue vindicar sus intereses privados. Por lo tanto, resolvería que la controversia en el caso de autos no es una “disputa obrera” para efectos de la Ley Núm. 50, supra. A diferencia de la Mayoría del Tribunal, entiendo que este caso no se refiere a los términos o a las condiciones de empleo de trabajadores ni es en relación con la organización o representación de éstos o sobre la negociación, la fijación, el mantenimiento, el cambio o el esfuerzo para convenir términos o condiciones de empleo. Además, al no clasificar la presente controversia como una disputa obrera y permitir, por lo tanto la expedición de un injunction contra la AAA, no se afectarían los derechos constitucionales y estatutarios de los trabajadores. Por eso, no estamos ante una situación a la cual se puede aplicar la prohibición de la Ley Núm. 50, supra.
Por último, sólo queda por discutir si el injunction dictado se expidió conforme a derecho. De la prueba presentada ante el Tribunal de Primera Instancia surge que el Plan probó los requisitos necesarios para la concesión de un injunction. Un plan de salud opera a base del dinero que ingresa en concepto de primas mensuales, el cual se va gastando conforme se utilicen los servicios del plan por los suscriptores. En su comparecencia, la OCS explicó que si la AAA no paga las primas adeudadas y no continúa con los pagos sucesivos de éstas, se produciría un menoscabo de activos en el Plan. A su vez, esto causaría un problema serio de flujo de efectivo que impediría que el Plan cumpla con los pagos a los proveedores de servicios. Esta situación provocaría el colapso económico del Plan ante su incapacidad de cumplir con sus compromisos contractuales, y traería como consecuencia inmediata el que la OCS liquide al Plan e impida su funcionamiento como organización de servicios de salud. Además, los proveedores de servicios del Plan le han notificado su intención de dejar de atender a *642 los asegurados si no reciben el pago inmediato de lo que se les adeuda. Esto, sin duda alguna, demuestra la naturaleza e irreparabilidad del daño que puede causársele al Plan si no se pagan inmediatamente las aportaciones que le corresponden. Debido a la urgencia del Plan de recibir activos y la amenaza cercana de su posible liquidación, el tramitar esta reclamación por la vía ordinaria contra la AAA tornaría en académica la controversia. Por consiguiente, no hay un remedio adecuado en la vía ordinaria que evite que la controversia se torne académica y los posibles daños de mayor consideración a la actual situación económica del Plan.
A la luz del derecho aplicable, el Plan tiene probabilidad de prevalecer en la resolución final de este caso. La deuda de la AAA es líquida y de fácil determinación, además de que la obligación consta claramente en un documento firmado por las partes. La AAA estaba obligada a pagar estas primas al Plan, ya que por medio del contrato y de sus acciones permitió que sus empleados eligieran libremente entre dos planes médicos. Sin embargo, continuó pagando las primas a uno y se abstuvo de enviarle los pagos correspondientes al otro. Esto es un patente incumplimiento de su parte. La propia AAA reconoce la deuda y su actuación intencional de retener los pagos correspondientes. Por último, no permitir el injunction tendría un impacto considerable sobre el interés público, ya que expondría a miles de asegurados y sus familias a quedarse sin plan médico, además de permitir que deudas millonarias con proveedores de salud queden incumplidas.
Por todo lo anterior, entiendo que tanto el foro primario como el apelativo actuaron correctamente en este caso y disiento del dictamen emitido hoy.

 La política pública de la Ley Norris-La Guardia se encuentra contenida en su See. 2, que dispone:
"... el trabajador individual y no unionado se encuentra usualmente desprovisto del disfrute de su derecho a la libertad de contratación e imposibilitado de proteger su libertad de trabajo, y a su vez de obtener términos y condiciones aceptables de empleo, por lo tanto, aun cuando es libre para no asociarse a sus compañeros, es necesario que tenga la libertad plena de asociación, organización y de elección de sus representantes, de negociar los términos y condiciones de su empleo y de estar libre de interferencia, restricciones o coacción de parte del patrono o sus agentes, en la elección de sus representantes, en el ejercicio de su derecho a organizarse o en otras actividades concertadas con el propósito de negociación colectiva, de ayuda mutua o de protección; por consiguiente, promulgamos las siguientes definiciones de y limitaciones a la jurisdicción y autoridad de los tribunales ....” (Traducción nuestra.) 29 U.S.C.A. see. 102.

 La Ley Núm. 50 de 4 de agosto de 1947 (29 L.P.R.A. sec. 101 et seq.), dispone que un injunction que prohíba los actos contenidos en su Art. 2 (29 L.P.R.A. see. 102) sólo podrá ser emitido, a pesar de existir una disputa laboral, bajo las circunstancias siguientes:
“(a) Que se ha amenazado cometer y se cometerán actos de fraude o violencia, a menos que se impidan o se han cometido y continuarán cometiéndose dichos actos a menos que se impidan!,] pero no se expedirá ningún injunction ni orden de entredicho temporal con motivo de amenaza o acto alguno de fraude o violencia excepto contra la persona o personas o la asociación u organización que hiciere la amenaza o cometiere el acto de fraude o violencia o que realmente autorizare dicho acto después de tener conocimiento real del mismo;
“(b) que habrán de resultar daños sustanciales e irreparables a la propiedad física del querellante;
“(c) que en cuanto al remedio solicitado para cada alegación resultaría mayor perjuicio para el querellante negándosele el remedio que el que habría de resultar para los querellados si se concediera el remedio;
“(d) que el querellante no tiene ningún otro recurso adecuado en derecho, y
“(e) que los funcionarios públicos encargados del deber de proteger la propiedad del querellante no pueden o no están dispuestos a proporcionar la protección adecuada.” 29 L.P.R.A. see. 105.
Por lo tanto, la intervención de los tribunales en disputas obreras se permitirá sólo cuando el orden público pueda verse afectado y no se pueda asegurar que la disputa obrera se resolverá de forma pacífica y ordenada.

 La definición que da la Ley de Relaciones del Trabajo de Puerto Rico al concepto “disputa obrera” es casi idéntica a la dada en el inciso (c) del Art. 9 de la Ley Núm. 50, supra, 29 L.P.R.A. sec. 109(c). Según la Ley de Relaciones del Trabajo de Puerto Rico, “disputa obrera”
“[ijncluye cualquier controversia relativa a los términos, tenencia o condiciones de empleo o en relación con la organización o representación de empleados o sobre negociación, fijación, mantenimiento, cambio o esfuerzo para convenir términos o condiciones de empleo, estén o no los disputantes en la relación inmediata de patrono y empleado.” Art. 2 (29 L.P.R.A. sec. 63(6)).

 Se ha entendido que las “disputas obreras” se pueden dividir en cuatro categorías:
(1) las causadas por la interpretación o incumplimiento de un convenio colectivo;
(2) las que se relacionen con los términos y las condiciones de empleo;
(3) las controversias entre dos o más uniones en cuanto a su jurisdicción sobre determinadas unidades de trabajo, y
(4) las concernientes a los derechos de los obreros a organizarse y a negociar colectivamente con su patrono. E.M. Dangel y I.R. Shriber, The Law of Labor Unions, Massachussets, National Law Publishers, 1941, Sec. 8.

 Ese es el caso, por ejemplo, de las compañías aseguradoras comerciales, que ofrecen algunas cubiertas a grupos selectos de individuos. Usualmente esto se hace por medio de seguros grupales (group insurances), en los cuales mediante una póliza de seguro se ofrece cobertura a varios individuos. Estos seguros limitan la cobertura de sus pólizas a determinado grupo de individuos, que pueden ser empleados, industrias, comercios o asociaciones profesionales. La forma más común de los seguros grupales es el seguro médico grupal que ofrecen los patronos a sus empleados. Véase R.E. Keeton, Basic Text on Insurance, Minnesota, Ed. West Publishing Co., 1971, Sec. 2.8, págs. 62-66; R.E. Keeton y A.I. Widiss, Insurance Law: A Guide to Fundamental Principles, Legal Doctrines, and Commercial Practices, Minnesota, Ed. West Publishing Co., 1988, Sec. 2.6, págs. 103-106; Couch on Insurance 3d Cap. 8, Secs. 8:1-8:76 (2005).

 En la estipulación se dispuso lo siguiente en torno al plan médico:
“Las partes aquí comparecientes acuerdan que con relación al Plan Médico UIA, Inc. se constituirá una Junta de Directores Interina de dos (2) representantes nombrados por la UIA; dos (2) representantes nombrados por la AAA y un quinto miembro, quien presidirá la Junta. Este quinto miembro, según acordado por las partes, será el Monseñor Roberto González.” Petición de certiorari, Apéndice, pág. 93.

 Otra prueba de la independencia institucional entre la Unión Independiente Auténtica (Unión) y el Plan de Salud de la UIA, Inc. (Plan) es la demanda de injunction y en cobro de dinero que ha incoado la administración del Plan contra la Unión. Además, los planteamientos de la Unión en su moción sobre la intervención de la Oficina de la Comisionada del Seguros (OCS) reflejan el funcionamiento autónomo de ambas entidades. En esa moción del 16 de febrero de 2006, la Unión expresó su insatisfacción con las actuaciones del Plan y con la invitación que la administración de éste extendiera a la OCS para fiscalizar sus operaciones. Las críticas formuladas por la Unión manifiesta claramente que el Plan no es álter ego de la Unión, como ha argüido la AAA.

 La estipulación dispone, en lo pertinente:
“Los unionados seleccionarán libremente el Plan Médico de la UIA Inc. o el Plan Médico Triple S. Ninguna de las partes hará campaña para la selección del Plan Médico. La aportación de primas de la AAA al Plan Médico UIA, Inc. para los empleados que prefieran dicho Plan, comenzará a partir del mes de octubre del 2004.” (Énfasis suplido.) Petición de certiorari, Apéndice, pág. 93.

 En el Documento Aclaratorio de junio de 2005, las partes suscribientes acordaron:
“1. A tenor con la certificación emitida por la Comisionada de Seguros el 23 de junio de 2005, ésta certifica que las primas del Plan de Salud UIA, Inc. (PSUIA, Inc.) correspondientes a los meses de agosto a diciembre de 2004 son una deuda de la UIA, según Resolución Corporativa firmada por la Junta de Directores de la UIA. La Unión Independiente Auténtica, por la presente, se compromete a asumir el pago de las aportaciones al PSUIA, Inc. correspondiente a los meses de agosto a diciembre de 2004. Lo anterior no podrá interpretarse como una modificación a los términos contenidos en la estipulación firmada entre la AAA y la UIA del 28(29) de diciembre de 2004.
*635 “De igual forma, la Unión Independiente Auténtica se compromete a asumir cualquier menoscabo al PSUIA, Inc. correspondiente a los meses de enero al 30 de junio de 2005, atribuible a apropiación ilegal, malversación, mal uso de fondos o negligencia del Administrador del Plan, y que surja como resultado de la auditoría que la Oficina del Comisionado de Seguros (OCS) realizará a partir de agosto de 2005. De surgir un menoscabo no atribuible a las razones anteriores, se procederá de conformidad a lo estipulado en el convenio colectivo.
“3. Como parte de este compromiso de la Unión Independiente Auténtica, la Autoridad de Acueductos y Alcantarillados remitirá al Plan de Salud UIA las aportaciones correspondientes a los meses de enero a mayo de 2005. La AAA. reanudará las aportaciones pendientes al plan del 1 de junio del 2005 en adelante sujeto a los siguientes incisos.
“a. El Plan someterá no más tarde del 31 de julio de 2005 la información requerida por la Oficina de Comisionada de Seguros (OCS).
“b. Tan pronto se reciba la certificación sobre la solvencia financiera del Plan, la AAA remitirá al Plan de Salud la aportación correspondiente al mes de junio de 2005.
“c. De surgir un menoscabo atribuible a las razones expuestas en el inciso 2 y una vez cubierto el mismo, la AAA reanudará las aportaciones mensuales.
“d. De concluir la auditoría de la OCS sin señalamiento de menoscabo, la AAA reanudará las aportaciones mensuales a partir del 1 de junio de 2005.” (Énfasis suplido.) Petición de certiorari, Apéndice, págs. 103-105.

 La situación jurisdiccional podría ser distinta si antes de que los tribunales hubieran asumido jurisdicción se hubiera presentado una querella por práctica ilícita o la Junta de Relaciones del Trabajo hubiese actuado sobre el derecho público que se pudiera derivar de la presente controversia. La conclusión que se deriva de esta discusión no impide que en su día la Unión acuda ante la Junta con una querella de práctica ilícita contra su patrono, en representación de los unionados que vean afectado su derecho a un plan médico por la negativa del patrono de hacer los pagos correspondientes.

 Desde el 28 de diciembre de 2005, autorizamos la comparecencia de la OCS en calidad de amicus curiae. En su comparecencia especial, la OCS explicó la situación económica del plan de salud y los efectos sobre ésta de la negativa de la AAA a pagar las primas adeudadas hasta el momento. Además, la OCS ha estado participando constantemente durante el trámite del caso de autos, ofreciéndonos la información necesaria para atender nuestras inquietudes sobre la situación económica del Plan y los efectos que tendría la eventual resolución del caso. Entre sus comparecencias se destaca una de 10 de julio de 2006, en que la OCS informó, entre otras cosas, que después de revisar los estados financieros del Plan, tuvo que notificar a dicha entidad que tendría 90 días, a partir del 9 de agosto del 2006, para cubrir el menoscabo de activos causado por la falta de pago de primas. Indudablemente, esta comunicación destaca la urgencia que tiene la resolución final de este caso.